344 So.2d 1353 (1976)
Brenton T. MORSE, Jr., Plaintiff-Appellant-Relator,
v.
J. RAY McDERMOTT & CO., INC., et al., Defendants-Appellees-Respondents.
No. 57984.
Supreme Court of Louisiana.
December 13, 1976.
On Rehearing April 11, 1977.
Rehearing Denied May 13, 1977.
*1354 Joseph S. Russo, Jefferson, for plaintiff-applicant.
Herschel L. Abbott, Jr., Edward B. Poitevent, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-respondents.
Charles I. Denechaud, Jr., Denechaud & Denechaud, M. Truman Woodward, Jr., Michael J. Molony, Jr., David Conroy, William C. Gambel, Charles A. Snyder, Hilton S. Bell, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, John C. Blackman, Hudson, Potts & Bernstein, Monroe, Richard P. Wolfe, Monroe & Lemann, Frederick S. Kullman, Clyde Hancock Jacob III, Kullman, Lang, Inman & Bee, Max Nathan, Jr., New Orleans, William H. Cook, Jr., Shreveport, and Michael E. Guarisco, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, amici curiae.
TATE, Justice.
The plaintiff Morse, a former employee of J. Ray McDermott & Co., Inc. ("McDermott"), sues to recover amounts allegedly due under the company's supplemental compensation and retirement plans. Made defendants are the company and its retirement trust.
McDermott terminated Morse's employment due to an economic downturn in 1970. It is conceded that Morse was without fault. Due to termination of Morse's employment, certain clauses in the company's plans, if valid, require forfeiture (or, at least, prevent vesting) of all credits and contributions made to the plans on his behalf as a contractual benefit of his employment.
The issue presented by this litigation is whether the forfeiture or non-vesting clauses in question are enforceable as applied to the facts of the case. The trial court held that they are and the court of appeal affirmed, with two judges dissenting. 330 So.2d 411 (La.App. 4th Cir. 1976), certiorari granted 333 So.2d 240 (La.1976).
We reverse: The employee's discharge of the blameless employee prevented the latter from receiving any value or benefit whatsoever from prior payments or credits which, when made by the employer, were in the nature of deferred compensation for the employee's prior services. As applied to the present circumstances, for reasons described below, the forfeiture and non-vesting clauses are unenforceable as contrary to law and public policy (Civil Code Articles 11, 1892, 1894, 2031): specifically, the policy provided by La.R.S. 23:634 (prohibiting forfeiture of earned wage-benefits), in conjunction with the legal principle represented by Civil Code Article 2040 (insofar as preventing a party from benefiting from a contractual forfeiture or default which will result solely because he himself caused it).

*1355 I.
The plaintiff Morse worked on a salary for McDermott from 1958 to 1970, a total of 11½ years. This included 5 years in Nigeria and Venezuela, company-designated "hardship areas". His employment was terminated in 1970, not because of any fault of his, but because the company was experiencing an economic downturn.
Although not yet of retirement age at the time he was fired, Morse was a participant in the company's retirement plan. He also had received "supplemental compensation" awards the last four years of his employment. He sues to recover for all sums in these plans attributable to his employment with McDermott.
Supplemental Compensation Plan
McDermott's supplemental compensation plan was adopted in 1966 to reward salaried managerial employees and to induce them to continue in their employment with the company. It was partly based upon a recognition that such employees worked many hours overtime and contributed to increased productivity of the company, although they received during the year preceding the award only their regular salaries as compensation for their service.
Under the plan, a fixed percentage of the company's profits is placed each fiscal year in a reserve. Supplemental compensation awards are made from this reserve by a committee on the basis of each employee's contribution to the success of the company during the year.
"Current awards"[1], such as that here involved, are made annually at the discretion of the committee to each deserving employee in a given amount. At the time of the current award, its amount is made payable in five equal installments. The first installment is paid when the award is made, and the others are to be paid on July 15 of each of the four succeeding calendar years during which the employee remains in the company's employ.
The supplemental compensation plan provides, however, that if employment is terminated for reasons other than death, disability, or retirement, then all unpaid portions of prior current awards are forfeited.
Morse was awarded current awards totaling $9,731.00 from 1966 to 1969, the last four years of his employment. In accordance with the terms of the supplemental compensation plan, prior to his discharge he had received all four installments of the 1966 award, three installments of the 1967 award, two installments of the 1968 award, and only one installment of the 1969 award.
Since he was no longer in the company's employment on June 15, 1970, he did not receive the installments falling due on that date and thereafter. These "forfeited" installments amounting to $5,016.00 form the basis of Morse's supplemental compensation claim.
Retirement Plan
McDermott's retirement plan was first established in 1962 and was later revised in 1968. Contributions to the plan are made yearly by the employer. Employees with three or more years' service are included in the actuarial computation to determine the payment by the company into the plan each year.
However, no amount is credited to the individual account of an employee until after that person has been employed by the company for 15 years. Likewise, under the terms of the plan, benefits are not payable to anyone with less than 15 years of service except in cases of death or disability.
Generally, employees who have completed 15 years of service with the company may retire of right at age 65. The size of an employee's pension is based upon the number of years of service he has completed with the company.
*1356 Early retirement is possible as early as age 50, but the employer's consent is required unless the early retirement is due to credit earned for service in a contractually-defined "hardship area". Because pensions are based upon years of service, an early retiree loses credit for years he might have worked. In addition, the pensions of those retiring earlier than age 60 are reduced by an "early retirement reduction factor".
After he has reached age 45 and has completed 15 years of service, an employee whose service is terminated for any reason other than death, disability, or retirement is entitled to receive a pension upon reaching age 65 (or, if he has performed service in a hardship area, at an earlier age). The monthly pension is based upon the value, at the termination of employment, of the retirement benefit the terminated employee would have received if he had stayed with the company until the date pension payments are to commence.
The retirement plan expressly provides that an employee is not entitled to any benefit under the plan if his service is terminated for any reason other than death or disability prior to the date as of which he has both attained the age of 45 years and completed 15 years of service.
At the time his employment was terminated, Morse had 11½ years of service with the company, five of which were performed in a hardship area.
Had he stayed with the company another 3½ years, he would have been entitled to early retirement of right at age 55. Had his employment been terminated after the accumulation of 15 years of service and at a time after he had reached the age of 45 years, Morse would have been entitled to a monthly termination pension at age 60 for life.
However, at the termination of his employment, Morse had not been employed with the company for a full 15 years. Under the literal terms of the retirement plan, therefore, he is entitled to no benefits whatsoever.

II.
The defendants contend that the payments made to the retirement plan by the employer on the employee's behalf were gratuitous, as were the profit-sharing credits made as current awards to the employee under the supplemental payment plan.
However, "To be gratuitous, the object of a contract must be to benefit the person with whom it is made, without any profit or advantage, received or promised as a consideration for it." Civil Code Article 1773. To the contrary, the evidence indicates that the retirement and profit-sharing plans were not only designed to reward worthy employees for their services but also (for the employer's benefit) to induce them to continue in the company's service (so as to make further contributions to the company's successful operation). The nature gratuitous payments versus delayed compensationof employer contributions to similar retirement and profit-sharing plans was at issue in T. L. James & Co. v. Montgomery, 332 So.2d 834 (La.1976), although in a somewhat different context. We there stated, 332 So.2d 840-41:
"Only the employer contributes to the plans, but the contribution is not without reciprocal contribution on the part of the employee, although these are intangible and difficult to evaluate. It is a reward by the company to promote loyal and efficient service on the part of the employee. The plans are, moreover, an inducement to employees to remain in the service of the company to enjoy the benefits the plans promised. In short, the contribution of the employer is not a purely gratuitous act, but it is in the nature of additional remuneration to the employee who meets the conditions of the plan. The employer expects and receives something in return for his contribution, while the employee, in complying, earns the reward. The benefits to the employee *1357 are, therefore, earned incomeproperty within legal contemplation."[2]
A majority of American jurisdictions similarly reject the contention that retirement and profit-sharing benefits are merely gratuities payable at the will of the employer. They instead characterize an employer-financed retirement or profit-sharing plan as a contractual inducement by the employer for the employee to remain in the employer's service, the benefits from which are in the nature of delayed compensation for the employee's services on behalf of the employer.
See decisions of American jurisdictions summarized and discussed at: Annotation, "Rights and Liabilities as Between Employer and Employee With Respect to General Bonus or Profit-Sharing Plan," 81 ALR 2d 1066, Sections 3, 4 (1962), and Later Case Service; Annotation, "Rights and Liabilities as Between Employer and Employee With Respect to General Pension or Retirement Plan," 42 ALR 2d 461, Sections 3, 4, 5 (1955) and Later Case Service; 60 Am.Jur.2d "Pensions and Retirement Plans", Sections 73-75.[3]
Accordingly, we conclude that the employer's contributions to the profit-sharing and retirement plans were in the nature of delayed compensation to the employee for his services during the period for which each contribution was made. The implicit bargain was that the benefits based upon this additional compensation would be payable to the employee if (in addition to his past services) he continued his employment with the company for a stipulated period.
At least part of the cause or motive, Civil Code Article 1896, of the employing company for the contract was to induce the employee (for the benefit of the company) to continue in his employment with the company for at least a stipulated period.

III.
Nevertheless, our decision in T. L. James & Co. v. Montgomery, cited above, concerned only the disposition of benefits based upon delayed compensation similar to the present which, under the terms of the plans there in question, had actually become payable. It did not reach or consider the present issue:
Even if under the terms of a plan no interest of the employee has "vested" so as to become payable, are there ever circumstances where nevertheless the employee may recover such deferred compensation (or its value or benefits based thereupon) despite contractual clauses which require forfeiture or prevent vesting should the employment terminate prior to a vesting date?
The decisions of other jurisdictions almost uniformly hold that, by his voluntary resignation, the employee's own act may cause forfeiture or prevent vesting; the employee thus has not performed his portion of the bargain necessary to complete his entitlement to the delayed compensation. See decisions in above annotations, 42 ALR 2d 861, Section 8(a) and 81 ALR 2d 1066, Section 6. For somewhat similar reasons, the forfeiture and non-vesting provisions are likewise enforced if the employee is discharged *1358 for cause before he had completed the stipulated service.[4]
The enforceability of the forfeiture and non-vesting clauses, where the employee resigns or is discharged for cause, is justified in the light of the purposes and respective causes or motives (Civil Code Article 1896) of the parties in making a contract similar to the present. "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts * * *." Civil Code Article 1764. "Agreements legally entered into have the effects of laws on those who have formed them. * * *" Civil Code Article 1901.
Nevertheless, stipulations voluntarily entered into between the parties may be considered null if contrary to public policy established by laws enacted for the preservation of social order or if contrary to moral conduct (contra bones mores). Civil Code Articles 11, 1892, 2031.[5] See Planiol, Civil Law Treatise, Part I, Nos. 288-295 (La.State Law Institute translation, 1959). See, e.g.: Succession of Butler, 294 So.2d 512 (La.1974); Mid-Continent Refrigerator Company v. Williams, 285 So.2d 247, 251-52 (La.App. 3d Cir. 1973).
It is not necessary that the entire agreement containing the stipulation against public order or policy be declared null. As Planiol notes, with reference to a French code article identical to our own Civil Code Article 2031 (footnote 5), an immoral or illegal condition within a contract annuls the entire agreement only "to the extent to which the agreement depends on it. The judges are therefore always free to recognize, by interpretation of the will of the parties, that the condition inserted in the contract is only an accessory clause to which the contract was not subject for its existence; in which case, the illegal, immoral or impossible condition is effaced and the agreement subsists as to the rest." Planiol, Volume 2, Section 1269, p. 720.

IV.
By reason of these code articles, the present forfeiture and non-vesting clauses are manifestly unjust, contrary to public order and public policy, and unenforceable, if sought to be applied in a circumstance where, by the unilateral act of the employer, the employee is prevented from performing his part of the bargain to complete vesting of deferred compensation benefits.[6]
*1359 Our decision in this regard does not rest upon a direct expression of legislative will, but instead upon the public policy evident in the prohibition against wage forfeitures under our law, La.R.S. 23:634[7], especially as interpreted in the light of the general principle that an obligor whose obligation is contingent upon fulfillment of a specified condition cannot defeat that obligation by preventing accomplishment of the condition, Civil Code Article 2040.[8]
First enacted by Act 62 of 1914 (which provided criminal sanctions for its violation), La.R.S. 23:634 prevents an employer from exacting of an employee an agreement by which the employee's earned wages shall be forfeited if the employee is discharged or resigns[9] before the contract is completed. See footnote 7 above. A companion provision, La.R.S. 23:640 (1966), provides that wages within the contemplation of this enactment shall include fringe benefits payable under collective bargaining contracts, including pensions.
The provisions together apply literally only to wages payable under written contracts of employment and to fringe benefits payable under collective bargaining agreements. Nevertheless, the public policy so expressed includes, within its prohibitory scope, forfeiture and non-vesting clauses such as the present, insofar as they permit an employer's unilateral act, see Civil Code Article 2040 (footnote 8), to cause forfeiture or to prevent vesting of deferred compensation credits otherwise earned by the employee.[10]
As Planiol notes, laws of "public order" (see Article 11, footnote 5) include laws which, in the interest of the public, prohibit private persons from entering into certain contracts. Planiol, Civil Law Treatise, Vol. I, Section 292 (LSLI translation, 1959):
"The modern law-maker, considering that the two parties to a certain juridical act are not equally able to defend their interests, prohibits them from departing from certain rules which he has laid down for their protection. It is for this reason that almost all provisions relating to contracts of labor are of public order because the law-maker desires to protect the laborer or the employee against the master." Id. at p. 201.
Accordingly, the employee is entitled to recover the value of his deferred compensation attributable to his employment, as represented by supplemental-compensation (profit-sharing) credits and by employer contributions on his behalf to the retirement plan trust fund. As will be noted, he *1360 is entitled to recover them from the employer alone, without (by reason of the present terms of the retirement plan) contribution from the trustee of the retirement plan.

V.
The employee's recovery is to be calculated as follows:
Supplemental Compensation Plan
With regard to the supplemental compensation plan, Morse is entitled to recover the entire $5,016 paid balance of his awards. These awards, although payable in installments, were already fully earned on the dates they were awarded, except for performance of the condition made impossible of his performance by his employer's discharge.
These amounts became due and payable on April 6, 1970, the date of the employee's discharge.[11] Legal interest would ordinarily be due from this time that the amount became due, Civil Code Article 1938, being then at the rate of five per cent per annum provided by Civil Code Article 2924 (before its amendment in 1970). However, since the plaintiff prayed for legal interest only from the date of judicial demand, the interest commences to run from that date instead. La. Civil Code art. 1938.
Retirement Plan
The same principles apply to the due date and legal interest on any lump-sum award made to the plaintiff-employee for the value of his deferred compensation owed him by the employer-caused non-vesting of his retirement plan rights.
Insofar as the award, however, the terms of the retirement plan bar the retirement committee and trustee from making any payments except as authorized by the retirement plan and trust agreements. In the absence of amendment of the trust and retirement plan so as to permit Morse to receive retirement benefits or a refund from the trust[12], the employer is liable for such amount (1) because his act deprived the employee of deferred compensation values otherwise earned by him and (2) because, by his unilateral discharge of Morse, the employer benefited by the forfeiture (see footnote 14) of the value of an interest in the retirement fund proceeds attributable to Morse's benefit.[13]
By way of deferred compensation, annually the employer made contributions to the *1361 retirement fund based on the employment of each employee with more than three years' service. They were made on the basis of an actuarial formula involving the age, salary, and other factors relating to each such employee.
In accord with the principles previously enunciated, the employee is entitled to recover from McDermott the value of his deferred compensation attributable to his employment, which McDermott's discharge prevented him from receiving. This should be in a sum at least equal to the percentage of each year's contribution attributable to Morse. For reasons of administrative convenience, this amount may be calculated instead on the basis of the credit to be received by the employer against his subsequent annual contributions by reason of the forfeiture of Morse's interest in the retirement funds[14], providing this amount is shown to be reasonably equivalent to the monetary amount of the employer's annual contributions attributable to Morse's service during his employment.
However, the factual record before us does not afford a basis upon which to calculate an award due to the employee based on the value of his deferred compensation attributable to the retirement fund contributions. The case must therefore be remanded to the district court for introduction of further evidence and for its determination of the amount of such award.
Furthermore, the retirement plan and trust may possibly be amended (see footnote 12) so as to grant Morse a termination pension similar to those payable under the retirement plan to persons with 15 years of service, but reasonably decreased to adjust for Morse's fewer years of service. We accordingly reserve to the defendants the right to so satisfy the employer's retirement plan liability to Morse rather than by the monetary award provided above. (In this latter event, of course, any legal interest will not become due except from the date of nonpayment of any payment of a termination pension so awarded.)

Decree
For the foregoing reasons, the judgments of the previous courts are set aside.
As to the claim for supplemental compensation benefits, we order, adjudge, and decree judgment in favor of the plaintiff, Brenton T. Morse, Jr., and against the defendant, J. Ray McDermott & Co., Inc., in the sum of Five Thousand and Sixteen ($5,016) Dollars, together with legal interest from date of judicial demand.
As to the claim for an award based upon the forfeiture of the employee's deferred compensation attributable to contributions made to the retirement plan, we remand this case for further proceedings in the district court consistent with the views previously expressed by us.
REVERSED; JUDGMENT AWARDED IN PART; REMANDED IN PART.
SANDERS, C. J., dissents with written reasons.
SUMMERS and MARCUS, JJ., dissent for reasons assigned by SANDERS, C. J.
SANDERS, Chief Justice (dissenting).
Brenton T. Morse, Jr., a former employee of J. Ray McDermott, Co., Inc., filed suit against his former employer to recover the balance of a supplemental compensation award and retirement benefits allegedly due. Both lower courts denied recovery.
McDermott employed Morse from June 1, 1958 until April 7, 1970, at which time he was terminated because of an economic downturn. Concededly, McDermott acted in good faith in terminating the employment.
In 1966, McDermott adopted a "Supplemental Compensation Plan" which annually *1362 rewarded certain managerial employees for their contribution to the company's increased productivity and income during the year. That plan was funded entirely by the employer; employees made no monetary contribution in any form. Morse's awards under this compensation plan from 1966 to 1969 totaled $9,731.00, of which he received payment of $4,715.00. He claims the balance of $5,016.00 is due him.
The supplemental compensation plan, under which he seeks recovery provided that awards were payable on the following basis:
"(1) A Current Award is made payable in five equal installments, 20% of the award to be paid to the Eligible Employee within thirty (30) days of the Committee's determination of the amount awarded to him pursuant to paragraph (b) of this section, and an additional 20% thereof to be paid on July 15 of each of the four succeeding calendar years; provided that (i) said Employee has been in the continuous employ of the Company or any of its Subsidiaries up to each such July 15 date, or (ii) at the time his employment shall have terminated prior to the last of such July 15 dates, the Committee, in its discretion, shall have waived such requirement of continuous employment, or (iii) his employment has terminated before the last of such July 15 dates as a result of death, disability or retirement (other than early retirement) under the Retirement Plan. In the event that his employment terminates under any other circumstances prior to receipt of the total amount of his award, the Eligible Employee shall forfeit all unpaid portions of said award."
As both lower courts held, the terms of the supplemental compensation plan are clear and unambiguous. The compensation plan specifically provides that if an employee terminates his employment with McDermott for any reason other than death, disability, or retirement under the Retirement Plan prior to the receipt of the total amount of the award, "the Eligible Employee shall forfeit all unpaid portions of said award."
Concerning the payment of deferred awards, the compensation plan provided expressly:
"(ii) A Deferred Award shall vest in the Eligible Employee at the rate of 20% thereof on the date of the award by the Committee, and on each July 15 of the four calendar years following the year in which the award is made, provided that (i) said Employee has been in the continuous employ of the Company or any of its Subsidiaries up to each such July 15 date, or (ii) at the time his employment shall have terminated prior to the last of such July 15 dates, the Committee, in its discretion, shall have waived such requirement of continuous employment, or (iii) his employment has terminated before the last of such July 15 dates as a result of death, disability or retirement (other than early retirement) under the Retirement Plan. In any of the events referred to under (ii) and (iii) in the preceding sentence, any portion of the award which has not yet vested in such Employee shall be deemed to have vested as of the termination of his employment. Upon termination of his employment the former Employee shall receive payment of the vested portions of his award in such installments as the Committee shall have determined at the time of the making of the award commencing on July 15 of the year following the year in which his employment terminates.
* * * * * *
"All unpaid portions of awards forfeited under paragraphs (i) and (iii) and portions of Deferred Awards which cannot become vested under paragraph (ii) of this section shall be credited to the Reserve, but shall not be included in Income."
Plaintiff was informed of the awards made to him by an annual letter. Each of those letters contains the following sentence:

*1363 "Current Awards are payable and Deferred Awards (payable in installments upon the termination of employment) vest in five equal installments commencing in the year the award is made provided that the participant remains in the continuous employ of the Company or a subsidiary to the time of each such annual payment or vesting."
As noted by the lower courts, the plan itself is the law between the parties and, absent a legal basis for judicial intervention, the plan must be followed as written. Under the terms of the plan, plaintiff was not entitled to the deferred installment benefits.
The retirement plan defines credited service as:
"Credited Service" means the total period of an Employee's Service, computed in completed years until the date of his actual retirement or termination of employment, or, if earlier, until the first day of the month coincident with or next following the date on which he attains the age of 65 years; provided, however, that all Leaves of Absence will be excluded from an Employee's Credited Service except the first two years of any absence after January 1, 1968 due to the Employee's compulsory engagement in military service and such other periods of Leaves of Absence as the Retirement Committee may allow on the basis of a uniform policy applied without discrimination."
The plan requires both that the employee complete fifteen years of service and attain a certain age in order to be eligible for early retirement benefits. Only the age requirement could be reduced on account of service in hardship areas. The 15-year service requirement is not affected by service in hardship areas.
The retirement plan also provides for benefits on termination of service at an earlier age, but that provision also requires fifteen years of service. Section 2.5 of the retirement plan provides:
"(1) In the event of the termination of a Participant's service prior to his Normal Retirement Date for any reason other than his death, early retirement as described in Section 2.2 hereof or disability retirement as described in Section 2.4 hereof, after he has both attained the age of 45 years and completed 15 years of Credited Service . . ." (Italics ours.)
Regardless, under any circumstances, the retirement plan specifically provides in Section 2.5 that with the exceptions of disability or death that:
". . . the Participant whose service is terminated prior to the date as of which he has both attained the age of 45 years and completed 15 years of Credited Service shall not be entitled to any benefit under the Plan whatsoever." (Italics ours.)
In my opinion, the terms of the retirement plan are clear and unambiguous. The employee did not qualify for retirement benefits until the conditions as provided in the plan were met. He did not complete fifteen years of credited service.
The majority holds that the provisions limiting the conditions under which payment is to be made to the prejudice of plaintiff are null, because they are contrary to public policy. See LSA-C.C. Arts. 11, 12, 1892.
I disagree with the holding. Significant here, I think, is the circumstance that the employee plans are entirely financed by the employer. The employee, of course, accepts the conditions of the plan by virtue of his acceptance of employment. Agreements of this type normally have the effect of law between the parties. LSA-C.C. Art. 1901. I find no adequate basis in public policy to invalidate the agreement in the present case.
For the reasons assigned, I respectfully dissent.

ON REHEARING
CALOGERO, Justice.
We granted rehearing in this case upon application of defendants-respondents McDermott and its Retirement Plan. They *1364 asked that we reconsider our original opinion in which we reversed the decision of the Court of Appeal affirming the district court judgment which had denied plaintiff monetary relief sought against the respective defendants in connection with J. Ray McDermott's Supplemental Compensation Plan and its Retirement Plan.
The facts which gave rise to plaintiffs' law suit, particularly as they relate to the two plans are set forth in our opinion on original hearing. We believe it advisable, nonetheless, to recite anew those basic facts and provisions, as we deem them pertinent and as we appreciate them, for resolution of the issues in this opinion on rehearing.

FACTS
Plaintiff Morse was employed by J. Ray McDermott & Co., Inc. from June 1, 1958 through April 7, 1970. It was stipulated that plaintiff's termination was not because of any misconduct on his part but had resulted from an economic downturn requiring a reduction of McDermott's personnel.
On March 31, 1966, four years prior to Morse's termination, McDermott had adopted a Supplemental Compensation Plan and had communicated this fact to its employees. The purpose of the plan as stated therein was to make provision for the payment of supplemental compensation to managerial and other key employees who contributed materially to the success of the company, thereby affording them an incentive for and a means of participating in that success. The parties stipulated in the district court that the purpose of the Supplemental Compensation Plan was "to reward those who contributed to the increased productivity of the company and to the increased income which the company produced thereby." They further agreed that the plan was developed "to assist salaried managerial employees who put in many hours of overtime but who received less than the hourly employees in terms of compensation and were limited by their salaries."
Under the plan the company agreed to maintain a reserve to which it would credit four percent of the amount by which the company income for each year exceeded an amount equal to ten percent of the capital employed in its business. Certain directors appointed by the board were to, and apparently did, form a committee to administer the plan. The plan was unilaterally proposed and adopted by McDermott, and the funding thereof was entirely by the employer.
From the reserve established, and as annually supplemented, the committee was authorized to make awards to employees. The awards as contemplated were designated "current" and "deferred," or a combination of the two, and they were defined in the plan. The awards to plaintiff Morse which are at issue in this litigation and which had been "allocated" to him, it was stipulated, were "current awards."[1] They were payable in five equal installments, twenty percent of the award to be paid to him within thirty days of the committee's determination of the amount awarded to him, and twenty percent thereof to be paid on July 15th of each of the four succeeding calendar years, provided that the employee remained in the continuous employ of the company up to each such July 15th date.
*1365 The plan provided that if the employment should terminate under any circumstances other than death, disability or retirement prior to receipt of the total amount of his award, the eligible employee would forfeit all unpaid portions of the award. However, the plan makes this forfeiture discretionary with the administering committee, for the committee is authorized to waive the requirement of continuous employment. In a case in which the committee chooses to waive the requirement, a terminated employee receives the unpaid portions of his award.
Plaintiff received current awards in the years 1966, 1967, 1968 and 1969, each one payable over five years in the stipulated twenty percent portions. At the time of his termination he had received four portions of the 1966 award, three of the 1967 award, two of the 1968 award and one portion of the 1969 award, a total supplemental compensation of $4715.00. He had not by then received one, two, three and four portions, respectively, of the 1966, 1967, 1968 and 1969 awards. These unreceived portions totalled $5,016.11 of supplemental compensation.
In Morse's case, the committee did not waive the continuous employment requirement, and by virtue of the plan's provisions the $5,016 earlier allocated to him was "forfeited" by Morse because of his termination and was "credited" to the company's supplemental compensation reserve. See Sec. 5(d)(iii). Such forfeited sum was not to be included in the company's income, nor, presumably, was it or the other monies in the reserve to be returned to the company,[2] but rather the forfeited sum was to remain in the reserve to be dispersed, along with all other monies therein, as future supplemental compensation awards for McDermott employees. Thus, indirect beneficiaries of the plaintiff's forfeiture were the employees of McDermott, more fortunate than plaintiff, who would continue in the employ of the company and perhaps receive future annual "current" or "deferred" awards. Also benefitting, again indirectly, was the company, for it was afforded more revenue with which to increase awards to other employees and thereby attempt to generate increased incentive for work effort and long employment.
The plan provided that no employee should at any time have any right to be granted an award for any fiscal year, and that allocation of a portion of the reserve to an eligible employee (i.e., the granting of an award) was to be made in the sole discretion of the committee as it determined was merited by that employee's contribution to the success of the company during a given fiscal year. Under any circumstances, however, no employee under the plan has "any interest whatever vested or contingent in any particular property or asset of the Company or any of its Subsidiaries by virtue of any award or any unpaid installment thereof." Sec. 3(c). There was further provision that "Eligible Employees receiving awards shall have no rights in respect to their award accounts, except the contractual right to receive the award as determined by the Committee subject to the conditions prescribed" in the plan. (emphasis supplied) Sec. 7(b). Also, the action of the company in establishing the plan and any action taken by the Committee under the plan and the provisions of the plan cannot, under the terms of the plan, "be construed as giving to any person the right to be retained in the employ of the Company or any of its Subsidiaries." Sec. 7(c).
As we read these provisions, the company, in effect, had agreed to give supplemental compensation for services performed by retrospective determination of the committee payable twenty percent at the time of the award and eighty percent in increments thereafter, so as to increase productivity at the company, to allow employees to share in the consequently increased profits, and to supply an incentive for continued future employment as well as continued future *1366 productivity. In case of termination (other than death, disability, or retirement) the employee would receive the already-earned portions of his award only if the committee chose to give them to him.
Like the awards they may receive from the Supplemental Compensation Plan, McDermott's employees also receive the benefit of its Retirement Plan. Employees make no contribution to the funding of the plan. Instead, annual contributions to the plan are made by McDermott. After three years with the company an employee becomes a participant, and he is then included in the actuarial computation to determine the annual payment by the company into the plan each year. No specific amount in the fund is credited to the individual account of an employee, and eligibility for benefits is not accomplished, except in cases of death or disability, until an employee has been with the company fifteen years and reaches age forty-five. Sec. 2.5(a). Achieving this minimum age and years of service for the first time guarantees to an employee pension benefits, payable at the earliest at age fifty-five.[3]
At the time his employment was terminated, plaintiff Morse had only eleven and one-half years of service with the company. Since at termination he had not been with the company for fifteen years, he was entitled under the terms of the plan to no retirement benefits at all. Sec. 2.5(a)(5).[4]
Certain specific provisions of the plan are pertinent to our inquiry into plaintiff's allegation that he was wrongly denied his retirement benefits. The plan, for example, expresses the employers' intention to make such contributions as are required to maintain the trust fund established for the purposes of the plan on a sound actuarial basis. Sec. 4.1. The employer specifically has no right, title or interest in the trust fund, (sec. 3.4) and the plan provides that no contributions made by the company shall revert to the employer, except such as might remain after satisfaction of all liabilities to persons entitled to benefits. Sec. 4.2. The plan further provides that its establishment and maintenance "will not be construed as conferring any legal rights upon any Participant to the continuation of his employment with [the] Employer, nor will the Plan interfere with the right of [the] Employer to discipline, lay off or discharge any Participant." Sec. 3.7. Nor shall the adoption and maintenance of the plan, according to its terms, be "deemed to constitute a contract between the Employer and any Employee or to be a consideration for, inducement to, or condition of employment of any person." Sec. 3.7.
Unlike the Supplemental Compensation Plan, therefore, no employee has an interest in the retirement fund, nor are there any amounts set aside for his account, nor is he assured of entitlement to any benefits at all prior to fifteen years service and age forty-five, and there is no discretionary right on the part of the fund's administrators to grant benefits not otherwise due under the specific terms of the plan. There is therefore no sum which is, or may be, subject to forfeiture or discretionary nonforfeiture by an employee terminated before achieving vesting.[5]
In our original opinion we considered simultaneously the Supplemental Compensation Plan's forfeiture provision and the Retirement Plan's nonvesting clauses. In our examination we considered as identical *1367 legal issues plaintiff's loss of future installments on the "current awards" and plaintiff's being denied any vesting in cash or prospective benefits under the Retirement Plan. We concluded that in each instance the employer's contribution was not gratuitous but was rather in the nature of delayed compensation for services previously rendered. We determined that the contractual provisions which dictated forfeiture (supplemental compensation plan) or prevented vesting (retirement plan) were null and void because contrary to public policy as gleaned from La.R.S. 23:634, prohibition against wage forfeiture, as interpreted in light of Article 2040 of the Civil Code which provides that an obligor whose obligation is contingent upon fulfillment of a specified condition cannot defeat the obligation by preventing occurrence of the condition.[6] Thus we determined there that plaintiff be allowed to recover deferred compensation and retirement benefits (or their value) despite the prohibitory contractual clauses (determined to be invalid).
What prompted the grant of rehearing was the belief that we may have erred in concluding on original hearing that the public policy of the state required invalidation of the contractual provisions of the retirement plan which prevent vesting prior to accomplishing a minimum age and years of company service. Upon reconsideration we conclude that we correctly found invalid the provision of the supplemental compensation plan which denied plaintiff receipt of the delayed portions of current awards, but that we incorrectly found to be contrary to this state's public policy the non-vesting provisions of the retirement plan.

THE SUPPLEMENTAL COMPENSATION PLAN
As an incentive for more conscientious performance of duty and as supplemental compensation, although unilaterally and retrospectively to be fixed, defendant McDermott had in effect promised to make monetary awards of a certain character. The plan itself refers to the right of the employee to receive the monies once they are awarded to him as a "contractual right." Sec. 7(b). After the plaintiff employee performed his services to the company's satisfaction, and in return therefor he was granted a "current award," i.e., twenty percent in cash, eighty percent set aside for him payable in successive annual sums over a four year period, when his employment was terminated through no fault of his own (nor, of course, that of the company) the plan committee in the exercise of its unfettered discretion determined not to waive the non-termination requirement so that over $5,000 of his already-earned compensation was "forfeited" by him and made available to the company for disbursement to other employees.
Such a provision simply is not valid. An employer cannot take a man's labor on the condition of possibly awarding him retrospective pay, then award him that retrospective pay, but deliver in cash only a portion of the award coincident with its grant, and then prevent him from collecting the delayed portions by terminating his employment without cause. Particularly must this be so where, as here, denying effect to the provision does not impose on the employer any supplemental obligation and where the company in its unfettered discretion may decide to make the payments to other similarly-terminated employees.
In reaching this conclusion, we are especially persuaded by the following facts. The reserve from which plaintiff's award was set aside had already been irrevocably set aside by the company. Future annual reserve credits (contributions) by the company were unaffected by plaintiff's forfeiture or non-forfeiture of portions of his *1368 earlier awards. The only effects of enforcing the provision are that an employee who continues in the employ of the company may (assuming the company gives him future awards) be indirectly benefited by having a larger reserve from which to have the committee allocate his awards, and the company indirectly benefits by having larger sums available with which retrospectively to compensate other employees and thereby induce longer and more productive service.
Moreover, all of what we said in our original opinion is correct and applicable to the controverted provisions of the supplemental compensation plan. The awards were not gratuities; they were in the nature of delayed compensation, or pay, for performed services during the periods for which each contribution was made. A supplemental cause or motive, see C.C. art. 1896, of the employing company in the contract was to induce the employee, for the benefit of the company, to continue his employment with the company. Plaintiff in this latter respect has performed and was ready and willing to continue his employment with the company. The plan's forfeiture clause therefore is manifestly unjust, contrary to public order and public policy, and unenforceable where sought to be applied in a circumstance where, as here, by unilateral act of the employer, the employee is prevented from performing his part of the bargain, i.e., to remain in service to the date on which the delayed portions are payable. The public policy which we here enforce is evident in the prohibition against wage forfeiture under our law, R.S. 23:634,[7] especially as interpreted in light of the general principle that an obligor, where his obligation is contingent upon fulfillment of a specified condition, cannot defeat that obligation by preventing accomplishment of the condition. C.C. art. 2040. When we apply that article to this situation, we conclude that this obligor, McDermott, is not allowed under our law to defeat its obligation to pay the remaining portions of Morse's compensation awards by preventing Morse from continuing his employment by terminating that employment without cause.
Defendants in rehearing brief strenuously urge that Civil Code Article 2040 does not apply here. They point out that the article admits of an exception where the debtor has simply exercised a legal right and cite us to the following language in Onorato v. Maestri, 173 La. 375, 137 So. 67 (1931):
"Article 2040 of the Civil Code admits of an exception, which arises whenever, in doing an act which results in preventing the accomplishment of the condition, the debtor, by thus acting, had exercised only a legal right. Such is the view of Pothier, expressed in commenting on a similar principle, and such is the view of the commentators on the Code of Napoleon, expressed in commenting on article 1178 of that Code. Pothier on Obligations, No. 212; Toullier, t. 6, No. 609; Laurent, t. 17, No. 76; Dalloz, Code Annotes, article 1178, No. 16; Baudry-Lacantinerie et Barde, Obligations, t. 2, No. 805; Demolombe, t. 25, No. 350."
They rely also on 4 C. Aubry & C. Rau, Cours de droit civil francais § 302, at 68 (6th ed. La.State L.Inst, transl. 1965) and Planiol et Ripert, Traite Pratique de Droit Civil Francais, 2d ed. Vol. VII, Obligations, Part Two (1974). And they argue that McDermott's discharging plaintiff was the exercise of such a legal right, citing C.C. art. 2747; Pechon v. National Corporation Service, 234 La. 397, 100 So.2d 213 (1958); Ingram v. Kaiser Alum. & Chem. Corp. (Gramercy Wks.), 323 So.2d 921 (La.App. 4th Cir. 1975); and Hodges v. Decoteau, 314 So.2d 500 (La.App. 1st Cir. 1975).
We concede that the foregoing is a correct statement of the law. Nonetheless, the *1369 exception to Article 2040 is unavailing here because of overriding considerations of justice, fair play and strong public policy against wage forfeitures, coupled with defendant's discretionary denial of plaintiff's earned compensation. Defendant could very simply have discharged plaintiff (which it had a right to do) while paying him his earned compensation, simply by waiving the non-termination requirement (such waiver being discretionary with them through their committee). The company's interest in not waiving the requirement (discussed hereinabove) is so insignificant in comparison with our strong public policy against wage forfeiture as to constitute neither a legitimate nor serious interest. The exercise of a right (here, to discharge an employee while opting not to waive the nontermination requirement) without legitimate and serious interest, even where there is neither alleged nor proved an intent to harm, constitutes an abuse of right which courts should not countenance. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919); see Onorato v. Maestri, supra; Julio Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965 (1975).
Thus, the otherwise permissible exercise of a legal right to discharge, in the situation where the employer has the discretion to obviate the harsh forfeiture consequence and chooses not to do so, is transformed from a legal right to an abuse of that right. For these reasons we conclude that defendant's discharge of plaintiff does not fit the "exercise of legal right" exception to Article 2040, that Article 2040 applies to the situation, and that defendant may not defeat its obligation to pay plaintiff has earned compensation by preventing fulfillment of the condition upon which the obligation depends.
For these reasons the forfeiture clause of McDermott's Supplemental Compensation Plan is against public policy, invalid and unenforceable. We need not here decide, and do not decide, whether the forfeiture clause of a different Supplemental Compensation Plan is or might be valid were there not also in the plan the provision which allowed this committee to waive the nontermination requirement.

THE RETIREMENT PLAN
The Retirement Plan, however is another matter entirely. While the existence of the Retirement Plan (with the concomitant inducement for lengthy service it engenders) may well be considered a fringe benefit of employment, it can hardly be considered pay in anything like the same sense that supplemental compensation is pay. There is no awarding, or setting aside, in the years of employment, of any sum to the credit of the employee. There is not even a promise, or statement, that the employee has "earned" anything in the retirement plan during his first fourteen years of company service. The specific provisions of the plan inform the employee otherwise. (See recitation of the substance of Section 2.5(a)(5), 3.4, and 3.7 hereinabove). Thus, plaintiff Morse received from the company no less, in terms of retirement benefits, than he was due.[8] For these reasons R.S. 23:634 and its prohibition against wage forfeiture is no comfort to plaintiff here.
And Civil Code Article 2040[9] avails plaintiff naught, for its application is barred by the exception where the debtor is merely exercising a legal right (which in this instance, unlike that relative to the Supplemental Compensation Plan, is not shown to be an arbitrary action taken without serious or legitimate interest).
In any event the strongest argument that this state's public policy does not prohibit the inclusion of non-vesting provisions in *1370 retirement and pension plans is a reference to the various statutes which, in creating and/or approving public pension systems, specifically include, and inferentially approve, non-vesting provisions which do not distinguish between voluntary terminations, involuntary terminations, terminations for cause and terminations without cause. Examples of legislative approval of such plans are numerous.
The Policemen's Pension and Relief Fund for the City of Lafayette where employees do not become eligible for retirement benefits until they have served continuously and actively for a period of twenty or twenty-five years is one of them. Forfeiture of funds contributed by the employer take effect when the discharge is "for reasons of economy or reduction in force due to no fault of the member." La.R.S. 33:2385, et seq. The Louisiana State Employees' Retirement System also provides for deferred vesting. Requirements for eligibility for benefits under this plan are thirty years service for retirement at any age, twenty-five years service for retirement at age fifty-five, ten years service at age sixty, etc. La.R.S. 42:541, et seq. If an employee is released by the state prior to reaching retirement eligibility, he receives no state funded benefits from the plan. Employment can be terminated if an employee's position is abolished or needs to be vacated for any reason. La.Const. Art. XIV, § 15(J) (2) (1921); La.Const. Art. X, § 10(A)(3) (1974).
The L.S.U. Retirement System provides for complete forfeiture by the employee and the employee is denied accrued benefit if the employment terminates for reasons other than retirement or death with fewer than five years of service. La.R.S. 17:1634-35A. See also La.R.S. 17:1611, et seq. The Parochial Employees' Retirement System likewise provides for no vesting if his employment terminates because of death or retirement. La.R.S. 33:6171, et seq. And the Municipal Police Employees' Retirement System provides for forfeiture if a member ceases to be an employee, except if that cessation is by death or retirement. La.R.S. 33:2376G. See also State School Employees Retirement System, La.R.S. 17:881, et seq.; Orleans Parish School Employees Retirement System, La.R.S. 17:1011, et seq.; Firefighters' Pension and Relief Fund, La.R.S. 33:2101, et seq.; Pension Fund for New Orleans [Policemen], La.R.S. 33:2281, et seq.; Registrar of Voters Employees' Retirement System, La.R.S. 18:1651, et seq.; School Lunch Employees' Retirement System, La.R.S. 17:1231, et seq.; The Municipal Employees' Retirement System, La.R.S. 33:7151, et seq.
Furthermore, even were we to hold otherwise, it is unlikely that we would be able to enforce the retirement contract while voiding only the non-vesting provisions. It is of course true, as we said originally, that an entire agreement containing a stipulation against public order or policy need not be declared null, that we are free to recognize by interpretation of the will of the parties that the condition inserted in the contract is only an accessory clause to which the contract was not subject for its existence, and that in that event the illegal, immoral or impossible condition is effaced. The agreement subsists as to the rest. II Plainol, § 1269, p. 720. But it is totally unrealistic to designate as merely accessory a provision in the plan which is inextricably interwoven into the cost fabric from which the employee formed the very plan, in its entirety, which affords the employees prescribed potential retirement benefits. Unlike the Supplemental Compensation Plan, the Retirement Plan with its prescribed level of benefits could not have been instituted without preclusion of benefits for short term employees, at the cost which the employer unilaterally undertook to furnish. It is rank speculation, and not at all likely, that the company would have instituted this retirement plan, with its various benefit provisions, irrespective of inclusions of the cost-reducing non-vesting provisions.
Even the federal act on which plaintiff relies, (ERISA, Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *1371 et seq.) is supportive of defendant's position. That Congress now requires vesting after ten years in private pension plans[10] inferentially finds acceptable plans with non-vesting provisions during the first ten years of an employee's service.[11]
The employees' expectations of retirement benefits are subject to the terms and conditions of the plan. The plan here is clear and unequivocal and its provisions for non-vesting are not illegal. Morse is therefore not entitled to any cash or benefits under the Retirement Plan.
For the reasons assigned, the judgment of the Court of Appeal insofar as it denied plaintiff's prayer that defendant account to and pay him sums and/or benefits to which he might be entitled under the Retirement Plan is affirmed. The judgment of the Court of Appeal insofar as it denied plaintiff's prayer for the recovery of delayed portions of current awards under the Supplemental Compensation Plan is reversed and there is judgment in favor of plaintiff Brenton T. Morse, Jr. and against J. Ray McDermott and Co., Inc. in the full sum of $5,016 together with legal interest from the date of judicial demand until paid and for all costs of this suit. There is reserved to plaintiff Morse the right to apply for a rehearing on the Retirement Plan issue.
SANDERS, C. J., concurs in the decree upholding the retirement plan, but otherwise dissents.
SUMMERS, J., dissents from the judgment granting an award to plaintiff in the claim based on the Supplemental Compensation Plan and concurs in the result denying recovery on plaintiff's claim based on the Retirement Plan.
DIXON, J., concurs with reasons.
MARCUS, J., dissents in part and concurs in part and assigns reasons.
DIXON, Justice (concurring).
I fully concur in the result reached in the majority opinion, only disagreeing with that portion of the opinion which seems to recognize a non-codal exception to C.C. 2040. The exception is one which was stated (and not applied) in Onorato v. Maestri, 173 La. 375, 137 So. 67 (1931). That exception is said to be that when a debtor has exercised only a legal right in preventing the other party from performing a condition to a contract, C.C. 2040 does not apply, and the condition is not considered as fulfilled.
The so-called exception developed from ideas expressed in Roman maxims, and is based on the notion that one can neither profit from his own wrongdoing nor be penalized for doing that which he had a right to do. 35 La.L.Rev. 1015, 1017 (1975). The concept that rights are not absolute, but are relative, a doctrine in development in Europe for many years, is explained by Louis Josserand, De l'esprit des droits et de *1372 leur relativite: The orie dite de l'abus des droits (1927). The doctrine of "abuse of rights" (a contradiction in terms, according to Planiol), is related and has found further acceptance and utility in Europe. Julio Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965 (1975).
Even Pothier recognized that lawful acts might not be done with impunity when the direct consequence is harm to another. Pothier, Law of Obligations, or Contracts, Vol. I, § 212 (1853).
C.C. 2040 has received scarce attention and little development in Louisiana for the reason that, ordinarily, courts have found debtors to be under an obligation not to do what was done when the performance of the condition was prevented.
Even under the examples explained by Pothier in his § 212 cited have, it seems the condition of continued employment would have been considered to have been fulfilled by McDermott's discharge of Morse. Pothier considered that the principle was operative only when the acts of the debtor directly prevented the accomplishment of the condition. If the acts of the debtor indirectly prevented the accomplishment of the condition, it was not then to have been considered fulfilled.
Planiol's Elementary Treatise on The Civil Law also casts doubt on the validity of the "exception" to Code Napoleon 1178 (C.C. 2040):
"However, the condition is considered as fulfilled, when it is the debtor who, by his act, has prevented its fulfillment (Art. 1178). The act of the debtor, even when free from fraud, causes to the creditor a prejudice for which reparation is due, and the most complete reparation which can be offered to the creditor is the execution of the obligation, as if the condition had been accomplished. The act of the debtor can consist of any act whatsoever which prevents the realization of the condition. See for example an act of violence against the creditor. Cass Req., 10 Feb. 1926, P. & S. 1927.1.60."
Planiol, Traite Elementaire De Droit Civil, English Translation by La. State Law Institute, Vol. 2Part 1, 388A, 220 (1939).
Until the place of C.C. 2040 in the law of obligations in Louisiana has been more fully explored, it should not be assumed that there is an exception to the article which may be destructive of its utility; it should not be assumed that if the fulfillment of the condition has been prevented by the debtor "who only does what he had a right to do," then C.C. 2040 is not applicable.
When the time comes, this court should probably interpret C.C. 2040 as it is written, and permit no exception unless the act of the debtor preventing the fulfilling of the condition did so only indirectly or remotely.
MARCUS, Justice (dissenting in part and concurring in part).
I dissent from portion of majority opinion finding invalid the forfeiture clause of McDermott's Supplemental Compensation Plan denying plaintiff the delayed portions of current awards; however, I concur in the majority holding that the non-vesting provisions of the Retirement Plan are valid.
NOTES
[1] The plan also provides for "deferred awards". These vest gradually over several years. They are payable in installments after an employee's service with the company is terminated. No "deferred awards" are at issue here.
[2] On rehearing, we reiterated this holding, 332 So.2d 851:

"The contribution of the employer into these plans is not a purely gratuitous act, but it is in the nature of additional remuneration to the employee who meets the conditions of the plan. The employer expects and receives something in return for his contribution, while the employee, in complying, earns the reward. The credits to these plans, when made, are in the nature of compensation (although deferred until contractually payable)."
[3] The defendants rely upon several cases from other jurisdictions representing the minority view that profit-sharing and pension benefits are unenforceable gratuities: Borden, et al., v. Skinner Chuck Co., 21 Conn.Sup. 184, 150 A.2d 607 (1958); Parrish v. General Motors Corp., 137 So.2d 255 (Fla.App.1962); Montgomery Ward & Co. Inc. v. Guigen, 112 Ind.App. 661, 45 N.E.2d 337 (1942); Friedman v. Romaine, 77 Misc. 2d 134, 352 N.Y.S.2d 351 (1974) and Judd v. Wasie, 211 F.2d 826 (8th Cir. 1954).
[4] Nevertheless, at least some decisions of other jurisdictions indicate that non-vesting or forfeiture of an employee's rights may not be caused by the employer's arbitrary discharge of him before the vesting age or date. Wilson v. Rudolph Wurlitzer Co., 48 Ohio App. 450, 194 N.E. 441 (1934); Freund v. Laendenbank Wien Aktiengesellschaft, 111 N.Y.S.2d 178 (Sup.Ct., Trial term, 1949), affirmed 277 App.Div. 770, 97 N.Y.S.2d 549 (1950). See also: Conner v. Phoenix Steel Corp., 249 A.2d 866 (Del. 1969).
[5] These code articles provide:

Art. 11. "Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
"But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good."
Art. 1892. "That is considered as morally impossible, which is forbidden by law, or contrary to morals. All contracts having such an object are void."
Art. 1895. "The cause is unlawful, when it is forbidden by law, when it is contra bonos mores (contrary to moral conduct) or to public order."
Art. 2031. "Every condition of a thing impossible, or contra bonos mores (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it."
See also:
Art. 12. "Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed."
Art. 19. "When to prevent fraud, or from any other motives of public good, the law declares certain acts void, its provisions are not to be dispensed with on the ground that the particular act in question has been proved not to be fraudulent, or not to be contrary to the public good."
[6] We should note that the recently enacted federal Employee Retirement Income Security Act is in part an attempt to deal legislatively with the inequities of pension forfeitures. The Act recognizes the pension problem presented for long-time employees by job termination and provides a partial solution by means of minimum vesting standards. See 29 U.S.C.S §§ 1001, 1053 (1974). The Act, however, was not adopted until four years after the instant plaintiff's employment was terminated after 11½ years of service.
[7] La.R.S. 23:634 provides: "No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed * * *."
[8] Article 2040 provides: "The condition is considered as fulfilled, when the fulfillment of it has been prevented by the party bound to perform it." As noted by George W. Garig Transfer v. Harris, 226 La. 117, 75 So.2d 28, 32 (1954), the meaning of the clause is "that the condition is considered as accomplished, when the debtor, bound under that condition, prevents the accomplishment of it."
[9] As earlier stated, however, under the instant clauses the employee does not earn his deferred compensation if, in violation of the purpose of the agreement, he resigns before completion of the term contractually required for vesting of the delayed compensation.
[10] The courts of this state have noted that forfeitures of wages are not favored under our law. See Knight v. Oden, 16 La.App. 605, 282 So.2d 612 (La.App. 1st Cir. 1973); United Shoe Stores Co. Inc. v. Dryer, 135 So. 50 (2nd Cir. 1931). We do not believe adoption in 1966 of Act 536 (LSA-R.S. 23:640) expressly including pensions and other fringe benefits payable under collective bargaining agreements was intended to have the effect of excluding other fringe benefits from the definition of "wages." Passage of the act is indicative merely of the legislature's responsiveness to the concerns of labor interests that fringe benefits might not be considered "wages." If anything, it indicates that the legislature does consider fringe benefits wages within the meaning of La.R.S. 23:634.
[11] Since this is an action for the payment of wage benefits, presumably the one-year prescription provided by Civil Code Article 3534 applies. However, since no prescription is pleaded in this case, it is not necessary to pass upon this issue.
[12] The retirement plan and trust agreement do seem to permit liberal amendment, Sections 1.1, 4.3, and liberal interpretation by the retirement committee, Section 5.5, to effectuate its provisions. No such amendment or interpretation has yet been made, however, which would permit the award of benefits to the present employee or the return of a cash value measured by employer-payments made to the fund insofar as attributable to the employee's employment.
[13] As stated in the dissenting opinion in the court of appeal, 330 So.2d 416:

"Complete forfeiture of plaintiff's pension rights because of involuntary termination without cause is contrary to contract law and to notions of basic fairness and justice. A retirement plan is a continuing offer by the employer to induce employees to remain in service, and the offer may be accepted by the employee's continuing in service. 1A Corbin, Contracts § 153 (1963); Delaware Trust Co. v. Delaware Trust Co. [43 Del.Ch. 168], 222 A.2d 320 (Del.Ch.) (1966). From the point of view of the employee, the forfeiture of his rights by early termination without fault on his part: is the equivalent of loss of compensation for services already performed. On the other hand, when a longtime employee's rights are forfeited, the employer (who has already received these services as partial consideration for retirement plan contributions) also receives (and is unjustly enriched to that extent) a reduction in future premium liability for the remaining covered employees. See Lucas v. Seagrave Corp., 227 F.Supp. 388 (D.Minn. 1967); see also 15 Vill.L.Rev. 527, 556 (1970). Thus, the employer receives employee services, but in fact gets back the retirement contributions made as consideration for those services already performed."
[14] When forfeiture of an employee's potential right to share in the retirement funds occurs because of termination of the individual's employment, these forfeitures are not used to increase the benefits of the remaining employees but, rather, to reduce the cost to the employer of his subsequent annual contributions. Section 2.12.
[1] This provision reads as follows:

"A Current Award is made payable in five equal installments, 20% of the award to be paid to the Eligible Employee within thirty (30) days of the Committee's determination of the amount awarded to him pursuant to paragraph (b) of this section, and an additional 20% thereof to be paid on July 15 of each of the four succeeding calendar years; provided that (i) said Employee has been in the continuous employ of the Company or any of its Subsidiaries up to each such July 15 date, or (ii) at the time his employment shall have terminated prior to the last of such July 15 dates, the Committee, in its discretion, shall have waived such requirement of continuous employment, or (iii) his employment has terminated before the last of such July 15 dates as a result of death, disability or retirement (other than early retirement) under the Retirement Plan. In the event that his employment terminates under any other circumstances prior to receipt of the total amount of his award, the Elibible [sic] Employee shall forfeit all unpaid portions of said award." Sec. 5(d)(i) (emphasis added)
[2] Actually there was a single, continuous reserve, not represented by any special or separate fund, and not segregated, the awards being paid from the general funds of the company. Sec. 3(c).
[3] Retirement at an age earlier than fifty-five years is permitted where an employee has served in a "hardship" area. Sec. 1.1(18)(b)(iii). Various provisions not here pertinent regulate the amount of the retirement benefits and an employee's eligibility for those benefits at various ages. Sec. 1.1(23).
[4] Sec. 2.5(a)(5) provides that "Except as provided in Section 2.4 with respect to disability retirement and Section 2.5 with respect to death, the Participant whose service is terminated prior to the date as of which he has both attained the age of 45 years and completed 15 years of Credited Service shall not be entitled to any benefit under the Plan whatever."
[5] Provisions for forfeiture alluded to in our original opinion (see footnote 14 and the sentence to which it relates in our original opinion) appear at Section 2.12 which apparently refers to forfeiture by a retired participant or a terminated participant who is entitled to benefits, when such person engages in competitive employment.
[6] Article 2040 of the Civil Code provides in full that:

"The condition is considered as fulfilled, when the fulfillment of it has been prevented by the party bound to perform it."
[7] Louisiana Revised Statutes 23:634 provides in full that, "No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation."
[8] In fact, plaintiff received death and disability protection under the retirement plan for the time that he was employed by McDermott. Practically half of the company's contributions to the retirement plan has been funding for the death and disability protection offered to employees by the Retirement Plan, according to McDermott.
[9] See footnote six for the exact language of Article 2040.
[10] This federal statute, passed in 1974, has no effect upon this litigation.
[11] With respect to ERISA, and the considerations which went into its formulation, we deem it worth noting language in the following Senate and House reports.

The Senate Report reads:
"In considering a minimum vesting provision, it is especially important to balance the protection offered by the provision against the additional costs involved in financing the plan. Employees, of course, would be accorded the maximum protection in this regard if they were granted immediate and full vested rights to employer contributions. However, it is generally recognized that such a requirement for immediate and full vesting would not be feasible because it would involve such substantial additional costs for the financing of pension plans that it would tend to impede the adoption of new plans and the liberalization of existing ones." (emphasis added) S.Rep. No. 383, 93rd Cong., 2d Sess., (1974); 3 U.S.Code Cong. and Ad.News p. 4905 (1974).
The House of Representatives Report reads: "For reasons indicated above, your committee concluded that it is necessary and desirable to provide a minimum standard of vesting for all qualified pension plans. Clearly, however, it would be counter-productive to increase employer costs by more rapid vesting to such an extent as to significantly curtail the creation of new retirement plans (or to significantly curtail the increase of benefits in existing plans)." (emphasis added) H.R.Rep. No. 807, 93rd Cong., 2d Sess. (1974); 3 U.S.Code Cong. and Ad.News p. 4720 (1974).