# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-334


# RALPH J. HANKS

# VERSUS

# LOUISIANA COMPANIES


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2012-953
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## PHYLLIS M. KEATY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of James T. Genovese, Phyllis M. Keaty, and D. Kent Savoie, Judges.


**AFFIRMED AND RENDERED.**


H. Alston Johnson, III
Thomas H. Kiggans
Jessica Coco Huffman
Phelps Dunbar LLP
Post Office Box 4412
Baton Rouge, Louisiana 70821-4412
(225) 346-0285
Counsel for Defendant/Appellant:
      Louisiana Companies

**Christopher P. Ieyoub**
**Wesley A. Romero**
**Plauche, Smith & Nieset, LLC**
**Post Office Drawer 1705**
**Lake Charles, Louisiana  70602**
**(337) 436-0522**
**Counsel for Plaintiff/Appellee:**
        **Ralph J. Hanks**

**KEATY, Judge.**

Former employer, Louisiana Companies (LAC), appeals two judgments rendered in this suit brought against it by its former employee, Ralph J. Hanks (Hanks). By judgment dated August 3, 2015, LAC's motion for summary judgment was denied, and its reconventional demand was dismissed; Hanks' motion for summary judgment was granted in part and deferred in part, and Hanks was awarded damages on his claim for unpaid wages. On January 4, 2016, the trial court signed a judgment deciding all remaining issues and awarding Hanks penalties and attorney fees. LAC appealed both judgments.[1] Hanks answered the appeal. For the following reasons, we affirm, award Hanks additional attorney fees on appeal, and render.

## FACTS AND PROCEDURAL HISTORY[2]

Hanks worked for LAC and its predecessor (collectively LAC) as an insurance producer for twenty-three years before his employment was terminated without explanation on November 10, 2009. While employed at LAC, Hanks' main duties consisted of soliciting new commercial insurance customers and obtaining renewals from his existing customers. He worked strictly on commissions which were set forth in Risk Advisor Employment Agreements (Employment Agreements) that he and LAC entered into each year. In addition, Hanks had "the opportunity to earn LAC stock based on his individual production efforts" through a Producer Compensation Plan which contained a Producer Stock

---

[1] Hanks filed a motion for partial dismissal of LAC's appeal, asserting that it had not timely appealed the August 3, 2015 judgment. In an opinion rendered on June 29, 2016, a panel of this court denied Hanks' motion, finding "that the August 3, 2015 judgment was not immediately appealable under La.Code Civ.P. art. 1915(A)(5)" but became appealable after the trial court resolved the remaining issues in the case. *See Hanks v. La. Cos.*, 16-334, p. 7 (La.App. 3 Cir. 6/29/16) (unpublished opinion).

[2] The facts contained in this section are not in dispute for purposes of the rulings at issue in this appeal.

Bonus Plan (Bonus Plan). To qualify to participate in the Bonus Plan, Hanks had to build and maintain an annual "Book of Business" of at least $300,000.00. The Bonus Plan provided that "a stock bonus will be paid equal to 10% of the . . . Qualified New Business written since 01/01/02 for each of the five years after [Hanks] enter[ed] the program." Stock was awarded "based on the results achieved for the prior year." The terms of the Bonus Plan specified that "the stock **earned**" would "vest 5 years after the date of the award," but would be "forfeited" if the employee "leaves the firm within the 5-year vesting period." (Emphasis added.) Based upon his performance, Hanks earned 300 shares of stock in 2002, 1,100 shares of stock in 2003, 1,400 shares of stock in 2004, and 1,600 shares of stock in 2005 and 2006.

At the time Hanks was fired, LAC presented him with a Separation Agreement, Release, and Waiver (Separation Agreement) which he was given twenty-one days to consider. The Separation Agreement provided that Hanks would no longer be an employee of LAC as of December 31, 2009, which date was referred to as the "Termination Date" and which served as the Separation Agreement's effective date. Pursuant to the Separation Agreement, LAC offered to pay Hanks the greater of his 2009 commission income[3] or $68,000.00, plus a $75,000.00 separation payment, $30,000.00 of which would be paid on December 31, 2009, with the remainder to be paid in two equal installments of $22,500.00 due on the first and second anniversaries of his Termination Date. The Separation Agreement also provided that Hanks agreed to sell, and LAC agreed to purchase on December 31, 2009, the 1,400 shares of stock that Hanks owned and

---

[3] It was later determined that Hanks earned $67,038.87 in commissions in 2009.

which had vested, for $53,298.00, the stock's fair market value at the end of 2008.[4] LAC agreed to have an independent third party determine the fair market value the stock had on Hanks' Termination Date; any positive difference between those values would be paid in cash to Hanks on April 30, 2010, while any negative difference would be deducted from the $22,500.00 separation payment LAC agreed to pay Hanks on the first anniversary of his Termination Date.

In return, the Separation Agreement required Hanks to acknowledge that he had "been paid all compensation due him through the Termination Date" and that his 4,600 shares of non-vested stock would be cancelled. Hanks was also required to "unconditionally release" LAC "from any and all claims . . . or causes of action whatsoever, known or unknown," arising from his employment or termination, including claims relating to wages. Finally, Hanks was required to agree to not "directly or indirectly" solicit or service any of LAC's customers or work for any of LAC's competitors for two years. The Separation Agreement provided that if Hanks breached any of its provisions, any future payments that LAC owed him would be suspended, and he could be required to reimburse LAC for any amounts previously paid to him. The Separation Agreement lacked a provision as to the consequences if LAC were to breach of any of its provisions. Hanks signed the Separation Agreement on December 1, 2009.

On December 31, 2009, LAC paid Hanks $68,000.00 in commission income, $30,000.00 in severance pay, and $53,298.00 in exchange for his vested stock, as per the terms of the Separation Agreement. Although LAC did obtain an independent review showing that the stock's fair market value had increased by the

---

[4] LAC stock was valued at $38.07 per share at the end of 2008 (1,400 x $38.07 = $53,298.00).

3

end of 2009,[5] it failed to notify Hanks or pay him the positive difference of $2,660.00 by April 30, 2010, as promised. Instead, LAC paid Hanks that amount on October 7, 2010, after Hanks inquired about the result of the stock valuation that LAC had agreed to obtain.

In February of 2010, Hanks began working in Lake Charles for First Federal Insurance Services, LLC (First Federal), one of LAC's competitors. First Federal announced its hiring of Hanks on a local billboard and in an advertisement that appeared in a local newspaper. Thereafter, some of LAC's customers moved their business to First Federal. By letter dated December 22, 2010, LAC informed Hanks that it would not pay him any additional amounts due pursuant to the Separation Agreement because it determined that Hanks had directly or indirectly solicited twelve of its clients.

On March 8, 2012, Hanks filed suit against LAC, alleging that it had breached the Separation Agreement by failing to pay the remaining $45,000.00 in severance pay owed him. LAC filed an answer and reconventional demand, asserting Hanks had breached the Separation Agreement by violating its non-compete provision. Hanks filed a supplemental and amending petition in July 2012, asserting that LAC failed to timely pay wages owed to him, thus making it liable to him for "all damages allowed pursuant to Louisiana and Federal Law." In answer to LAC's reconventional demand, Hanks denied that he violated the non-compete clause, and he asserted that the clause was a nullity because it "improperly restricts [his] employment." LAC removed the matter to federal court in August of 2012, where it remained until it was remanded on May 6, 2015, upon joint motion of the parties.

---

[5] LAC stock was valued at $39.97 per share at the end of 2009.

Several weeks after the matter returned to the state court, Hanks filed a motion for summary judgment, asserting that there were no genuine issues of material fact in dispute such that he was entitled to the relief sought as a matter of law. He claimed that, after he was fired, LAC failed to unconditionally tender the wages owed him, instead requiring him to sign the Separation Agreement which provided that he make concessions that resulted in him receiving less compensation than he had earned. According to Hanks, the 4,600 shares of bonus stock that he had earned based upon his performance in 2002-2006 should be considered wages because his inability to meet the vesting requirements was caused by LAC's termination of his employment without cause. Citing civil code articles dealing with conditional obligations and dissolution and/or nullity of contracts, Hanks sought to have portions of the Separation Agreement dissolved or declared null. Hanks further argued that LAC breached the Separation Agreement by not paying him the $45,000.00 in severance pay that remained outstanding and by not timely paying him the increased value of the 1,400 shares of stock that LAC had bought back from him. As a result, Hanks alleged that LAC was in violation of La.R.S. 23:631-34,[6] otherwise known as the Louisiana Wage Payment Statute (LWPS), and he sought judgment against LAC awarding him all earned wages owed at the time he was fired, along with the amounts owed to him under the Separation Agreement, plus penalties and attorney fees. Hanks also sought dismissal of LAC's reconventional demand, claiming that the evidence showed he did not violate the Separation Agreement's non-compete clause.

---

[6] Hanks also alleged that LAC was in violation of La.R.S. 51:443-44, which pertains to commissions owed by a principal to a sales representative upon termination of a compensation agreement between them. The trial court agreed with LAC's arguments that those statutes did not apply to the employment relationship between it and Hanks. That aspect of the August 3, 2015 judgment has not been appealed.

5

Soon afterward, LAC filed a motion for summary judgment, claiming the undisputed evidence proved that Hanks had breached the Separation Agreement by indirectly soliciting some of its customers. In opposition to Hanks' motion for summary judgment, LAC argued that the claims based upon Hanks' unvested shares of stock were barred by the terms of the waiver and release contained in the Separation Agreement. LAC further claimed that neither the unvested stock awarded to Hanks under the Bonus Plan nor the remaining $45,000.00 in separation pay sought by Hanks qualified as "wages" under the LWPS. Moreover, it asserted for the first time that Hanks was fired for cause. Based upon the foregoing arguments, LAC sought summary judgment in its favor, dismissing Hanks' claims and awarding it the $30,000.00 sought in its reconventional demand for the amount it previously paid Hanks pursuant to the Separation Agreement.

The parties agreed to submit their cross-motions for summary judgment on briefs. On July 17, 2015, the trial court rendered a five-page Ruling on Cross-Motions for Summary Judgment (hereafter the "July 17th Reasons"), which were essentially reasons for judgment. In a Judgment dated August 3, 2015, which referenced its July 17th Reasons, the trial court granted Hanks' motion for summary judgment in part, declaring the Separation Agreement null and void and finding that LAC fired Hanks without cause. While it found that "the $75,000.00 'separation payment' was a calculation of Hanks' renewal commissions offered to entice [him] to sign the Separation Agreement," the trial court concluded that the amount was "not collectible because the Separation Agreement has been voided."

6

It determined that LAC owed Hanks $183,962.00,[7] which amount represented the value of Hanks' "stock bonus wages earned and due at the time of discharge."[8] After giving LAC a credit for the $30,000.00 severance payment it previously made to Hanks under the Separation Agreement, the trial court awarded judgment in Hanks' favor in the amount of $153,962.00. The trial court also found that LAC timely paid Hanks the 2008 value of his 1,400 shares of vested stock, but was five months late in paying him for the stocks' increase in value between 2008 and 2009. In addition, the trial court found that LAC had not acted in good faith, thus entitling Hanks to penalties and attorney fees pursuant to La.R.S. 23:632, the amounts of which were deferred to trial. Because it found that a genuine issue of material fact remained regarding the amount of consequential damages, if any, that LAC owed Hanks, that portion of Hanks' claim was also deferred to trial. The trial court denied LAC's motion for summary judgment and dismissed its reconventional demand with prejudice based upon its finding that Hanks did not violate the non-compete clause contained in the Separation Agreement.[9]

The parties agreed to submit additional memoranda to the trial court, addressing the amount of penalties Hanks was due under La.R.S. 23:632 and the extent of consequential damages, if any, Hanks suffered as a result of the non-compete clause contained in the Separation Agreement. The trial court rendered a Ruling on Damages on November 3, 2015 (hereafter the "Ruling on Damages"), in

---

[7] That figure was calculated by multiplying the number of shares of stock that Hanks had earned, but which had not vested, by the fair market value per share of LAC stock at the end of 2009 (4,600 x $39.97 = $183,962.00).

[8] As explained in the July 17th Reasons, the trial court determined that Hanks' 4,600 shares of earned stock immediately vested upon his discharge without cause, and thus, were wages for purposes of the LWPS.

[9] The August 3, 2015 judgment also denied Hanks' motion to strike portions of the exhibits attached to LAC's motion for summary judgment, but that aspect of the judgment was not appealed.

which it determined that LAC owed Hanks $42,257.70 in penalty wages pursuant to La.R.S. 22:632(A).  The trial court rejected Hanks' claim for consequential damages, concluding that even though it had nullified the Separation Agreement, Hanks was still bound by a non-solicitation clause contained in his 2009 Employer Agreement.  The trial court also concluded that Hanks was not entitled to non-pecuniary damages because LAC was free to terminate Hanks' employment with or without cause.[10]

A hearing was held on November 24, 2015, regarding the amount of attorney fees Hanks should recover pursuant to La.R.S. 23:632, and the trial court issued a ruling later that day (hereafter the "Ruling on Attorney Fees"), explaining that it would not award Hanks the full amount of the invoice submitted by his two attorneys because it found that "15 percent of the invoice is above that which should have reasonably been spent on the case."  On January 4, 2016, the trial court signed a Judgment finding that Hanks was entitled to penalties in the amount of $42,257.70 and attorney fees in the amount of $218,302.86.  As mentioned previously, LAC appealed both the August 3, 2015 and the January 4, 2016 judgments, and Hanks answered LAC's appeal of the January 4, 2016 judgment.

### ASSIGNMENTS OF ERROR

LAC assigns the following errors on appeal:

1. The Trial Court erred when it invalidated the Release.

2. The Trial Court erred when it required Louisiana Companies to prove that Hanks was terminated for cause to avoid immediate vesting of the unvested stock and held, as a matter of law, that Hanks was terminated without cause.

3. The Trial Court erred when it concluded that the stock issued to Hanks under the stock benefit plan was "wages" under the LWPS.

_____

[10] Hanks did not appeal the denial of his claims for consequential and non-pecuniary damages.

8

4. The Trial Court erred when it concluded that Louisiana Companies lacked a good[-]faith defense to Hanks' claims for unpaid wages.

5. The Trial Court erred in calculating the amount of penalty wages.

6. The Trial Court erred in awarding $218,302.08 in attorney fees.

In his answer to appeal, Hanks asserts that "[t]he trial court committed error by reducing the amount of the attorney fee invoice submitted by Hanks, finding that such amount was 15% above that which should have been reasonably spent on the case." He also seeks additional attorney fees for the work performed in conjunction with this appeal.

## STANDARDS OF REVIEW

Appellate courts "review a grant or a denial of a motion for summary judgment de novo." *Bridges v. Cepolk Corp.*, 13-1051, p. 10 (La.App. 3 Cir. 2/12/14), 153 So.3d 1137, 1145, *writ denied,* 14-901 (La. 8/25/14), 147 So.3d 1117. As noted in La.Code Civ.P. art. 966(A)(2), "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. . . . The procedure is favored and shall be construed to accomplish these ends." On de novo review, "there is no deference to the trial judge's legal findings, and we make an independent review of the evidence in determining whether there is no genuine issue of material fact and whether the mover is entitled to judgment as a matter of law under La.Code Civ.P. art. 966."[11] *Bridges*, 153 So.3d at 1145. "A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755.

---

[11] Louisiana Code of Civil Procedure 966 was amended by 2015 La. Acts No. 422, § 1, effective January 1, 2016. Accordingly, we refer to the version of the article that was in place on August 3, 2015, when the trial court rendered judgment on the parties' motions for summary judgment.

In *Bridges*, 153 So.3d at 1145, this court noted that "[b]ecause this case involves cross-motions for summary judgment, our task is to determine whether either party has established that there are no genuine issues of material fact and whether either party is entitled to judgment as a matter of law." In performing our de novo review in that matter, we applied "the burden of proof analysis under summary judgment article, La.Code Civ.P. art. 966(C)(2)." *Id.* According to that provision, as it then existed:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2). The rulings challenged in LAC's first four assignments of error were decided by the trial court upon consideration of cross-motions for summary judgment and, thus, are subject to de novo review on appeal.

We have found no cases stating the appellate standard of review as to the amounts of penalty wages and attorney fees awarded under the LWPS. Nevertheless, trial courts are generally vested with great discretion in determining the amounts of statutory penalties and attorney fees to award, and such awards should not be disturbed on appeal unless the trial court abused its discretion. *See, e.g.*, *Reiners v. St. Landry Hosp. Serv. Dist. Two*, 07-158 (La.App. 3 Cir. 5/30/07), 958 So.2d 783; *Cajun Concrete Servs., Inc. v. J. Caldarera & Co., Inc.*, 99-1205 (La.App. 5 Cir. 4/12/00), 759 So.2d 237. Accordingly, we will apply the abuse of

discretion standard of review in determining the merits of LAC's fifth and sixth, and Hanks' sole, assignments of error.

## THE LOUISIANA WAGE PAYMENT STATUTE

The cornerstone of the LWPS is found in La.R.S. 23:631,[12] which is titled "Discharge or resignation of employees; payment after termination of employment," and provides, in pertinent part, as follows:

> A. (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

This court has held that "[f]or the purposes of La.R.S. 23:631, wages are any amounts due under the terms of employment, which are earned during a pay period." *Williams v. Dolgencorp, Inc.*, 04-139, p. 5 (La.App. 3 Cir. 9/29/04), 888 So.2d 260, 263, *amended on reh'g,* (La.App. 3 Cir. 12/22/04), *writ denied,* 05-174 (La. 3/24/05), 896 So.2d 1042. An employer who conditions the payment of wages due a terminated employee upon the employee signing a form "releasing all rights" against the employer is in violation of La.R.S. 23:631. *Rush v. Ryan Chevrolet, Inc.*, 408 So.2d 984, 986 (La.App. 2 Cir. 1981).

An employer who fails to pay a former employee as directed in La.R.S. 23:631 "shall be liable" for penalty wages unless "the court finds that an employer's dispute over the amount of wages due was in good faith." La.R.S. 23:632(A) and (B). In addition, "[r]easonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be

---

[12] We recognize that this court in *Kidder v. Statewide Transport, Inc.*, 13-594 (La.App. 3 Cir. 12/18/13), 129 So.3d 875, held that the Federal Fair Labor Standards Act, 29 U.S.C.A. § 207, preempts the LWPS with regard to overtime provisions for employees engaged in interstate commerce, an issue that is not at play in this matter.

11

filed by the laborer or employee. . . ." La.R.S. 23:632(C). The LWPS specifically states that no employer "shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed . . . ; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation." La.R.S. 23:634(A).

## DISCUSSION

### *Validity of the Separation Agreement*

LAC argues that the broad waiver and release provisions contained in the Separation Agreement barred all of Hanks' claims against it related to his employment or termination, including those related to his unvested stock. It asserts that Hanks freely entered into the Separation Agreement, that he understood its provisions, and that no one at LAC pressured him to sign it. Moreover, it submits that the trial court erred in invalidating the Separation Agreement because public policy "favor[s] compromise agreements and finality of settlements." *Brown v. Drillers, Inc.*, 630 So.2d 741, 757 (La.1994).

LAC contends that the trial court erred in finding that it conditioned the payment of wages owed Hanks on his signing of the Separation Agreement. To the contrary, LAC contends that it would have paid Hanks his earned commissions plus the value of his vested stock by virtue of the Employment Agreements that it had entered into with Hanks before his termination. LAC explained that it "included the provisions concerning annual commission and payment for the vested shares of restricted stock in the Separation Agreement for the purpose of

12

having a single document incorporating all existing obligations between the parties, including those already reflected in other agreements."[13]

LAC further contends that any economic duress Hanks may have suffered because of his termination was not sufficient to vitiate his consent to the Separation Agreement. *See*, *e.g.*, *Comeaux v. Entergy Corp.*, 98-451 (La.App. 5 Cir. 4/14/99), 734 So.2d 105, *writ denied,* 99-1368 (La. 7/2/99), 747 So.2d 21. Finally, LAC submits that, even if the trial court correctly found that it breached the Separation Agreement, by failing to timely pay Hanks the increased value of his vested stock and/or by failing to pay the second and third installments of the separation payment, such breach does not require that the entire Separation Agreement be declared invalid. In that regard, LAC requests that this court give it the opportunity to pay Hanks the remaining $45,000.00 in severance pay that it owed him pursuant to the Separation Agreement.

Hanks contends that, based on the evidence LAC presented in support of its motion for summary judgment, the trial court properly found that it conditioned the payment of his 2009 commissions and the value of his 1,400 shares of vested stock on his execution of the Separation Agreement. Hanks argues that by presenting him with the Separation Agreement contemporaneously with telling him that he was fired and should immediately vacate his office, LAC was "impermissibly using the payment of a portion of [his] wages as leverage to secure a forfeiture of [his] remaining wages, release of any claims against LAC, and agreement not to compete." In support of his argument, Hanks points to a November 19, 2009 email that Mr. Dean received from his secretary at LAC informing him that "[i]f he

---

[13] This quote comes from a Declaration signed by LAC's Chief Financial Officer, Cameron Dean, on February 12, 2015, which was filed in federal court on May 22, 2015, before this matter was remanded to state court. The Declarations referred to later in this opinion were similarly filed in federal court.

doesn't sign the Agreement, them [sic] Kevin[14] told him he would be terminated at that time without the special payments and provisions that are offered under the Agreement."

Despite LAC's assertion to the contrary, Hanks submitted that "the fear of economic deprivation has been recognized as a species of duress sufficient to vitiate consent by the Louisiana Supreme Court. *Wolf v. La. State Racing Comm'n*, 545 So.2d 976 (La.1989)[.]" *St. Landry Homestead Fed. Sav. Bank v. Vidrine*, 12-1406, p. 24 (La.App. 3 Cir. 6/12/13), 118 So.3d 470, 488, *writs denied,* 13-2218, 13-2219 (La. 12/2/13), 126 So.3d 1283. Hanks points to his January 29, 2015 deposition, wherein he stated that he was "distraught and emotional" upon being fired, and he thought that if he declined LAC's offer, "they [would] give me nothing." While Hanks concedes that compromises are favored, he insists that those general notions of public policy are trumped by the specific provisions of the LWPS.

The wording of the Separation Agreement belies LAC's claim that it did not condition payment of Hanks' wages upon his signing of that document. The fourteenth provision of the Separation Agreement provides as follows: "This AGREEMENT, RELEASE AND WAIVER sets forth the entire agreement between the parties hereto and fully supersedes any and all prior discussions, agreements or understandings between the parties." The November 19, 2009 email also lends support to Hanks' claim that LAC had no intention of unconditionally paying him the wages owed upon his termination. Finally, Hanks undoubtedly experienced "fear of economic deprivation" sufficient to vitiate his consent to the Separation Agreement upon being fired with no prior warning and with no explanation. *Id.* After having performed a de novo review of the evidence, we

---

[14] The "Kevin" referred to in the email was Kevin Briggs, LAC's Chief Operating Officer.

14

conclude that LAC conditioned payment of Hanks' wages upon his signing of the Separation Agreement, in violation of La.R.S. 23:634. In addition, Hanks could not give valid consent to the Separation Agreement because of the duress he was experiencing following his termination. Thus, there were no genuine issues of material fact remaining such that Hanks was entitled to judgment voiding the Separation Agreement. Because the trial court did not err in invalidating the Separation Agreement, there is no merit to LAC's first assignment of error.

### *Are Hanks' Shares of Unvested Stock Wages under the LWPA?*

The Bonus Plan under which Hanks earned LAC stock provided that the stock would not vest until five years after it was awarded and that, if he left LAC within that five-year period, any earned stock would be forfeited. On the other hand, the Employment Agreements that Hanks signed for the years 2002-2006 provided that stock earned through the Bonus Plan would immediately vest if his employment ended due to death, retirement, disability, or a reduction in force unrelated to his job performance.

In his motion for summary judgment, Hanks argued that his 4,600 shares of earned but unvested stock, which had a value of $183,962.00 on his Termination Date, should be considered wages for purposes of the LWPS. The basis of Hanks' argument was the 2004 opinion rendered by this court in *Williams*, 888 So.2d 260, which cited with approval the Louisiana Supreme Court's decision in *Morse v. J. Ray McDermott & Co.*, 344 So.2d 1353 (La.1976). Relying on that jurisprudence, Hanks asserted that, because he was a productive employee who, at the time he was fired, intended to continue working at LAC for at least fifteen more years,[15] his stock would have vested had he not been terminated without cause.

---

[15] According to Hanks' February 13, 2015 Affidavit, he was fifty years old when he was fired.

In *Williams*, 888 So.2d 260, this court was presented with an appeal taken by an employer after the trial court rendered judgment in favor of the plaintiff, its former employee, declaring that a bonus she earned under the employer's incentive program was wages under the LWPS. Before her termination, the plaintiff participated in an incentive program implemented by her employer "that encourage[d] high performance and longevity while rewarding employees an annual bonus for their role in meeting company goals." *Id.* at 262. The program set forth eligibility requirements, including that the employee "be actively employed on March 15, 2002, [and] be a regular or full-time or part-time employee as of January 31, 2002." *Id.* at 261. The employer's fiscal year ended in January, and bonuses were calculated based upon each year's net profits. According to "the terms of the program[,] 'bonuses **earned** by any employee who is NOT employed on March 15, 2002, will be forfeited and a bonus will not be paid to that employee.'" *Id.* (emphasis added). The plaintiff, who suffered an on-the-job injury to her back in 1997 but had returned to work in a light-duty capacity, was fired on November 23, 2001, after she reinjured her back. The employer did not pay the plaintiff a bonus for the ten months she worked during the 2001 fiscal year because she was terminated before that fiscal year ended. At trial, the plaintiff testified that "she was able to continue her employment at light duty status and desired to do so"; her testimony was not contradicted. *Id.* at 263. The trial court rendered judgment in favor of the plaintiff, noting in its opinion:

> This decision is an outgrowth of the Louisiana Supreme Court decision in *Morse v. J. Ray McDermott & Co.*, 344 So.2d 1353 (La.1976), which was based both on the public policy of the state as expressed in R.S. 23:634, and on the fact that the employer prevented fulfillment of the condition of continued employment for reasons not attributable to the employee's misconduct. It is therefore the opinion of this court that the requirement of continued employment throughout the bonus period with no remedy for an involuntary

16

> termination that was not based on the employee's misconduct is unenforceable as against public policy and plaintiff is therefore entitled to collect a proportionate sum based on the amount of the bonus which had accrued at the time of her termination.

*Id.* at 262-63. Upon review, we found "no error in the trial court's consideration of the reason for termination in determining whether the [plaintiff] was entitled to the bonus," given that the terms of the bonus program specified that the plaintiff "would have forfeited all rights to the bonus if she had been discharged for gross misconduct," but was "silent on the issue of whether the bonus is affected when an individual is terminated against her will but not for misconduct." *Id.* at 263-64. We affirmed the trial court's finding that the plaintiff proved she was entitled to the bonus and that the bonus qualified as wages for purposes of La.R.S. 23:631, noting that "[t]o hold otherwise would encourage employers to terminate employees who have worked toward promised compensation just before they are to receive it, thus benefitting from, but not being required to compensate those deserving employees." *Id.* at 264.

In *Morse*, 344 So.2d 1353, the supreme court case referenced by this court in *Williams*, an employee who had been terminated due to "an economic downturn" brought suit against his employer after he was denied benefits under a supplemental compensation plan,[16] the purpose of which, as stipulated by the parties, was "'to reward those who contributed to the increased productivity of the company and to the increased income which the company produced thereby.'" *Id.* at 1364, on rehearing.[17] The employer maintained a reserve from a portion of its profits that could be awarded to deserving employees.

---

[16] The *Morse* plaintiff also sought benefits under a retirement plan.

[17] The supreme court rendered its initial opinion in *Morse* on December 13, 1976, reversing the judgments of the trial and appellate courts that denied the employee's claim for amounts due under the employer's supplemental compensation and retirement plans. On

[The awards] were payable in five equal installments, twenty percent of the award to be paid to him within thirty days of the committee's determination of the amount awarded to him, and twenty percent thereof to be paid on July 15th of each of the four succeeding calendar years, provided that the employee remained in the continuous employ of the company up to each such July 15th date.

The plan provided that if the employment should terminate under any circumstances other than death, disability or retirement prior to receipt of the total amount of his award, the eligible employee would forfeit all unpaid portions of the award.

*Id.* at 1364-65, on rehearing. Due to his termination, the plaintiff had to forfeit $5,016.11 that had previously been awarded to him pursuant to the supplemental compensation plan. The supreme court found that the awards made under the supplemental compensation plan "were not gratuities; they were in the nature of delayed compensation, or pay, for performed services during the periods for which each contribution was made." *Id.* at 1368, on rehearing. Thereafter, the court determined that:

The plan's forfeiture clause therefore is manifestly unjust, contrary to public order and public policy, and unenforceable where sought to be applied in a circumstance where, as here, by unilateral act of the employer, the employee is prevented from performing his part of the bargain, i.e., to remain in service to the date on which the delayed portions are payable. The public policy which we here enforce is evident in the prohibition against wage forfeiture under our law, R.S. 23:634.

*Id.*[18] (footnote omitted).

In the memorandum LAC filed in the trial court in support of its motion for summary judgment, it asserted that Hanks specifically acknowledged in the
_____
April 11, 1977, the supreme court issued an opinion on rehearing affirming the portion of its original opinion invalidating the forfeiture provision in the supplemental compensation plan. It reversed its finding that the non-vesting provisions contained in the retirement plan were against public policy and thus invalid. In doing so, the supreme court likened the retirement plan to "a fringe benefit of employment [that] can hardly be considered pay in anything like the same sense that *supplemental compensation* is pay." *Morse*, 344 So.2d at 1369 (emphasis added). It further noted that nothing is awarded to or earned by an employee who has not reached the minimum age and years of service required to become eligible to receive benefits under a retirement plan.

[18] Although La.R.S. 23:634 was amended in 1997, the version of the statute that was applicable in *Morse* was retained in the current version of La.R.S. 23:634(A).

18

Separation Agreement that all of his unvested shares of stock would be cancelled on December 31, 2009. Because we have determined that the Separation Agreement was invalid, LAC cannot rely upon the waiver provision therein contained. LAC also submitted that *Morse* was not applicable to this matter because it involved a "cash set aside and paid out over a 5 year period" rather than "a stock plan (i.e. an ownership interest in the company)." Alternatively, LAC noted that the Louisiana Supreme Court in *Morse* recognized that non-vesting provisions are enforceable in the case of an employee discharged for cause. Because it claimed that the evidence proved that it fired Hanks for cause, LAC argued that his unvested stock did not immediately vest due to the restrictions contained in the Employment Agreements that he signed.

We reject LAC's claim that *Morse* should not be applied in this matter simply because it concerned cash payments rather than stock bonuses. As noted by Hanks, the stock that he earned had a value which made it easily convertible to cash. Therefore, based on the principles outlined by the supreme court in *Morse*, as endorsed and expounded upon by this court in *Williams*, we conclude that Hanks' unvested stock vested upon his termination from LAC, unless he was terminated for cause.

In the memoranda he submitted in the trial court, Hanks argued that the evidence overwhelmingly supported his claim that LAC had no cause to fire him. He noted that LAC fired him and told him to vacate his office on November 10, 2009, without telling him why he was being terminated. He further noted that even after he filed this suit in March 2012, and amended his petition in July 2012 to assert a claim for unpaid wages, LAC waited several years to claim that he was fired for cause. Hanks submitted into evidence an affidavit that he signed on

19

February 13, 2015, wherein he stated that he had amassed 255 clients during his tenure at LAC, and that "[f]rom 1999 until 2006," he was "one of the top producers in [LAC'S] Lake Charles office." He explained that after a large number of his clients suffered damage from Hurricanes Rita and Ike, which occurred in September 2005 and September 2008 respectively, a large amount of his time was spent helping them with their insurance claims. Hanks further stated that, in spite of the stock market collapse in 2008 and the negative impact that the hurricanes had on the local economy, he obtained commissions for LAC that totaled $388,956,00 in 2007, $315,063.00 in 2008, and $253,350.00 in 2009, even though he was fired seven weeks before the end of 2009. Hanks also referred to the January 29, 2015 deposition of Cameron Dean, wherein he stated that there was nothing in Hanks' personnel file to indicate that his sales had declined or that he had exhibited any disruptive behavior.

Based on the foregoing evidence, we find that Hanks met his burden of proving "the lack of factual support" for LAC's claim that he was fired for cause. Thus, according to La.Code Civ.P. art. 966(C)(2), LAC was required "to produce factual support sufficient to establish that [it] will be able to satisfy [its] evidentiary burden of proof at trial" on that issue.

In support of its motion for summary judgment, LAC pointed to a Declaration signed by Mr. Dean, on February 12, 2015, wherein he explained that LAC "terminated Mr. Hanks' employment on November 10, 2009[,] for cause." Mr. Dean also stated that "[a]lthough I understand Mr. Hanks had other performance issues that contributed to his termination, Mr. Hanks' declining productivity was the primary reason for his termination." In a Declaration that was

20

also signed on February 12, 2015, Kevin Briggs,[19] LAC's Chief Operating Officer, and Hanks' immediate supervisor since 1999, stated that:

> Due to Mr. Hanks' declining productivity, as well as other issues, including Mr. Hanks' and my strained working relationship, Mr. Hanks' failure to fully commit to [LACs'] new sales strategy and Mr. Hanks' overly aggressive behavior when interacting with insurers, [LAC] terminated Mr. Hanks' employment on November 10, 2009[,] for cause.

In his memorandum in opposition to LAC's motion for summary judgment, Hanks challenged the veracity of LAC's supposed reasons for his discharge. He noted that on April 28, 2014, nearly ten months before Mr. Dean and Mr. Briggs declared that he was fired for cause, Mr. Dean signed a Declaration stating that the sole reason for Hanks' termination was his "declining productivity." According to Hanks, the change in Mr. Dean's explanation regarding LAC's reasons for firing him indicates that LAC concocted its claim that he was fired for cause in order to defend itself against Hanks' claims under the LWPS.

After having performed a de novo review of the evidence, we conclude that LAC failed to prove that Hanks was fired for cause. When LAC fired Hanks on November 10, 2009, it offered him no explanation for his termination. Instead, LAC waited several years to offer any reason as to why it fired a long-time employee who had acquired the business of a large number of clients, who earned LAC stock based on his performance in all the years the Bonus Plan was offered, and who was one of its top producers for the majority of his employment. If LAC truly fired Hanks' for cause, that cause should have been documented in his personnel file, and it should have been revealed to him at the time of his discharge, or, at the very latest, when Hanks amended his petition in July 2012 to assert that

---

[19] Mr. Briggs' Declaration was filed in the United States District Court for the Western District of Louisiana on May 22, 2015, before this matter was remanded to state court. It is attached as Exhibit D to LAC's motion for summary judgment.

LAC had not timely paid the wages owed to him. Based on the foregoing evidence, we conclude that Hanks established that he was entitled to judgment as a matter of law declaring that he was fired without cause. Thus, Hanks' 4,600 shares of previously unvested stock vested upon his discharge, and the value of those shares are considered wages for purposes of the LWPS. The trial court did not err in requiring LAC to prove that it terminated Hanks for cause to avoid the immediate vesting of Hanks' unvested stock, nor did it err in holding that Hanks was terminated without cause. Likewise, it did not err in concluding that the stock issued to Hanks under LAC's Bonus Plan was wages under the LPWS. Accordingly, LAC's second and third assignments of error lack merit.

**Did LAC Have a Good-Faith Defense to Hanks' Claim for Unpaid Wages?**

Hanks was an "at will" employee that LAC could fire at any time without having a reason to do so. *See* La.Civ.Code art. 2747. Nevertheless, whether it had good cause to fire becomes important in determining the penalties LAC owed Hanks for failing to timely pay the wages due him upon his termination. Louisiana Revised Statutes 23:632(B) provides, in pertinent part, as follows:

> When the court finds that an employer's dispute over the amount of wages due was in good faith, but the employer is subsequently found by the court to owe the amount in dispute, the employer shall be liable only for the amount of wages in dispute plus judicial interest incurred from the date that the suit is filed. If the court determines that the employer's failure or refusal to pay the amount of wages owed was not in good faith, then the employer shall be subject to the penalty provided for in Subsection A of this Section.

The penalty in La.R.S. 23:632(A) is the lesser of "ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee." "Statutes that authorize the imposition of penalties, or sanctions, are penal in nature and are to be strictly construed." *Saacks*

22

*v. Mohawk Carpet Corp.*, 03-386, p. 15 (La.App. 4 Cir. 8/20/03,), 855 So.2d 359, 370, *writ denied,* 03-2632 (La. 12/12/03), 860 So.2d 1158. "Penalties should not be imposed on the employer when it presents a good[-]faith non-arbitrary defense to its liability for unpaid wages." *Id.*

"[I]n order to avoid the statutory penalties [found in La.R.S. 23:632], an employer's tender of wages must be unconditional, and cannot be contingent upon the employee's execution of a release or compromise settlement." *Hess v. Pembo*, 422 So.2d 503, 508 (La.App. 4 Cir. 1982). In *Hess*, the fourth circuit noted that the "employer conceded that he owed certain commissions to a former employee at the time she left his employment, admitted that he owed additional commissions payable within a few months thereafter, and yet refused to make any payments to the employee for over a year after all uncontested commissions were due." *Id.* at 507. Based on those facts, the appellate court found "as a matter of law[, that] defendant's refusal to pay plaintiff *any* of the commissions due her constituted bad faith and subjects defendant to the penalties provided in LSA-R.S. 23:632." *Id.* at 508.

In its July 17th Reasons, the trial court found as follows with regard to whether or not LAC acted in good faith:

> LAC's failure to make an unconditional offer of any amount to Hanks at the time of his discharge constituted a "failure or refusal to pay" and lacked good faith. LAC made no attempt to comply with 23:632 or to recognize that 23:632 might apply. Indeed, LAC's heavy-handed approach of submitting to Hanks a lone option which included the relinquishment of rights and benefits lacked good faith. Also, LAC's failure to pay the agreed upon amount of commissions timely, and its failure to follow through with the later "separation payments" adds to the lack of good faith on its behalf.

On appeal, LAC argues that, even if this court determines that it conditioned Hanks' receipt of wages on his signing the Separation Agreement, it had a good-

23

faith belief that it did not. In addition, LAC submits that "the issue for purposes of penalty wages is unpaid wages[,] and Hanks was paid for all of the commissions and stock he earned during his employment." It points out that "by the time he signed the Release in December 2009, Hanks had already received his draws for the period through his November 2009 termination." Citing this court's decision in *Williams v. Lafayette Parish School Board*, 533 So.2d 1359, 1363 (La.App. 3 Cir. 11/9/88), *writ denied,* 536 So.2d 1237 (La.1989), LAC contends that because its delay in paying Hanks the additional value of his vested stock was the result of administrative oversight, this court should find that it had "a reasonable good[-] faith explanation" sufficient to deny Hanks' claim for penalty wages. Likewise, LAC contends that its failure to pay Hanks the remaining $45,000.00 in severance pay was not done in bad faith because it reasonably believed that he had breached the Separation Agreement by indirectly soliciting some of its customers. LAC further submits that because the trial court found that the severance pay it promised to pay Hanks in the Separation Agreement was not wages under the LWPS, its failure to pay Hanks the balance of the severance pay owed to him cannot serve as a basis to award him penalty wages. Finally, LAC claims that its failure to pay Hanks for his shares of unvested stock was based on its good-faith belief that the stock was not wages and, therefore, not due upon his termination.

Hanks counters that the very purpose of the LWPS is to prevent the "kind of abhorrent employer conduct" that LAC committed against him. He notes that LAC never unconditionally tendered any wages to him. Instead, LAC: 1) fired him without cause; 2) conditioned the payment of his previously earned wages upon his signing of a Separation Agreement that forced him to make several concessions; and 3) failed to tender the payments it obligated itself to make under the Separation

24

Agreement that it drafted. Hanks contends that those actions are indicative of bad faith on the part of LAC.

Our de novo review reveals that the following facts are not in dispute: 1) Hanks was fired and told to vacate his office on November 10, 2009; 2) 1,400 of the 6,000 shares of stock Hanks earned pursuant to LAC's Bonus Plan had vested by the time he was fired on November 10, 2009; 3) LAC presented Hanks with the Separation Agreement at the time he was fired; 4) Hanks performed no work for LAC after November 10, 2009; 5) Hanks signed the Separation Agreement on December 1, 2009; 6) the Separation Agreement provided that Hanks' Termination Date was December 31, 2009, rather than the date he was actually fired; and 7) LAC did not pay Hanks the value of his 1,400 shares of vested stock until December 31, 2009. Based upon those facts, we conclude that LAC violated La.R.S. 23:631 **before** Hanks signed the Separation Agreement on December 1, 2009, because it did not pay him the undisputed amount due, i.e. the value of his 1,400 shares of vested stock, within fifteen days of November 10, 2009, the date he was actually discharged. In addition, we have already found that LAC fired Hanks without cause; conditioned payment of his wages upon his signing of the Separation Agreement, in violation of La.R.S. 23:634; and failed to meet the terms that it agreed to in the Separation Agreement. The undisputed evidence, when viewed in its entirety, leads us to the inevitable conclusion that LAC did not have a good-faith defense to Hanks' claim for unpaid wages. Thus, we conclude that Hanks established that he was entitled to judgment as a matter of law, finding that he was entitled to penalty wages under the LWPS. There is no merit to LAC's fourth assignment of error.

25

*Penalties*

Because we have found that LAC lacked a good-faith defense to Hanks' claim for unpaid wages, La.R.S. 32:632(A) dictates that LAC "shall be liable to [Hanks] either for ninety days wages at [Hanks'] daily rate of pay, or else for full wages from the time [Hanks'] demand for payment is made until the employer shall pay or tender the amount of unpaid wages due [Hanks], whichever is the lesser amount of penalty wages." While it is undisputed that the lesser penalty in this case is ninety days of Hanks' wages, LAC and Hanks disagree as to how the amount of wages Hanks earned each day should be determined.

In the trial court, Hanks submitted that his daily rate of pay should be determined according to the formula set out in *Jeansonne v. Schmolke*, 09-1467, 09-1468, 10-437 (La.App. 4 Cir. 5/19/10), 40 So.3d 347. Like Hanks, the plaintiff in *Jeansonne* "was paid *solely* by commission." *Id.* at 361. The trial court in that case arrived at the employee's "daily rate of pay" by dividing the total amount of wages she earned in the previous year "by 250[,] to represent the normal number of working days in a calendar year; then the court multiplied the average daily pay by ninety to arrive at the penalty of ninety days wages authorized by the statute." *Id.* at 360-61. Hanks' 2009 Earnings Statement showed that his gross pay that year totaled $147,381.60. Because $30,000.00 of that amount consisted of the severance pay he received from LAC under the Separation Agreement, Hanks subtracted that amount to arrive at a figure of $117,381.60, which he divided by 250 to arrive at a daily pay rate of $469.53. Hanks then multiplied that daily rate by ninety to arrive at the amount of wages he earned in ninety days.[20]

---

[20] $469.53 x 90 = $42,257.70.

On appeal, LAC argues that, because Hanks should have excluded the $11,052.79 in taxes associated with his vested stock as well as a $6,931.99 bonus that he received in 2008 from his 2009 earnings, the amount of penalty wages awarded to him was excessive. Alternatively, LAC argues that Hanks' penalty wages should have been calculated by multiplying the minimum monthly draw he received in 2009 by three months. Using that formula, LAC submits that the penalty wages that it owes Hanks is $17,001.00.[21]

The trial court accepted Hanks' calculations and awarded him $42,257.70 in penalty wages. In doing so, it noted that because "Hanks was a true commission-based employee," his "draw amount was simply a payment against projected commissions, as opposed to a true guaranteed amount regardless of actual commissions earned." As a result, the trial court rejected LAC's argument that the penalty wages owed Hanks under La.R.S. 23:632 should be based on his minimum monthly draws. On appeal, Hanks points out that if his earned commissions were ever less than the amount of his monthly draw, he would owe LAC the amount of overpayment. In addition, Hanks notes that LAC failed to offer any legal authority to support its claim that certain amounts should have been excluded from his 2009 Earnings Statement.

We conclude that the law supports the methodology used by Hanks in determining his daily rate of pay for purposes of computing the amount of wages he earned in ninety days. Therefore, we find no abuse of discretion in the trial court's calculation of penalty wages Hanks was entitled to collect under La.R.S. 32:632. LAC's fifth assignment of error lacks merit.

---

[21] Hanks' 2009 minimum monthly draw was $5,667.00 (3 x $5,667.00 = $17,001.00).

***Attorney Fees***

"[R]easonable attorney's fees are to be awarded for a well-founded suit for any unpaid wages." *Saacks*, 855 So.2d at 371. "The suit is considered 'well-founded' and an award of attorney's fees is mandatory where the employee brings a successful suit and recovers unpaid wages." *Id.*

> Factors to be considered in determining the reasonableness of attorney's fees include the following: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge.

*Id.* (citing *Winkle v. Advance Products & Systems, Inc.,* 98-694 (La.App. 3 Cir. 10/28/98), 721 So.2d 983).

For purposes of the amount of attorney fees Hanks should recover under the LWPS, the parties stipulated that the hourly fees charged by Hanks' attorneys, Mr. Christopher Ieyoub and Mr. Wesley Romero, $300.00 and $150.00, respectively, were reasonable. After hearing the argument of counsel, the trial court determined that fifteen percent of the $256,826.89 fee invoice submitted by Hanks' attorneys was "above that which should have reasonably been spent on the case," and, thus, it awarded Hanks $218,302.86 in attorney fees.[22]

On appeal, LAC contends that, because Hanks did not specifically assert a claim for deficiency wages based on his unvested stock until August 18, 2014, when he filed a Second Supplemental and Amending Petition in federal court before this matter was remanded, his attorney fee award should have only included the work Hanks' attorneys performed after that date. Hanks counters that he first made a claim for unpaid wages when he amended his petition in state court on July 27, 2012, seeking to recover damages under Louisiana and federal law for

---

[22] Fifteen percent of $256,826.89 equals $218,302.86.

LAC's failure to timely pay wages owed to him. He points out that it was upon that basis that LAC removed the matter to federal court. Moreover, Hanks claims the trial court should not have discounted the fee invoice given the fact that his counsel had to review approximately 63,000 pages of documents in order to obtain the evidence that he presented on summary judgment and upon which judgment was rendered in his favor.

In its Ruling on Attorney Fees, the trial court went into great detail explaining how it assessed the reasonableness of the fee invoice submitted by Hanks' attorneys. It noted that the excellent outcome obtained by counsel was the result of extraordinary research, organization, and preparation. It described this case as more legally and factually complex than most, and it credited Hanks' attorneys with uncovering many facts in support of his claims. In addition, it found that the evidence presented by Hanks' attorneys demonstrated work product "of the highest level."

On the other hand, the trial court noted that counsel only had to make a few court appearances because this matter was decided upon motions for summary judgment. It was swayed by LAC's argument that, because Hanks' counsel did not specialize in the type of law involved in this matter and because Mr. Ieyoub and Hanks were good friends, more time and attention was spent on this case than would have been had those factors not been present. Finally, taking into account its belief that the amount awarded Hanks was on the high end of what could have potentially been awarded in favor of or against him, the trial court determined that Hanks should recover less attorney fees than he sought.

It is abundantly clear that the trial court gave thoughtful consideration to the factors that should be used in determining the reasonableness of the attorney fees

Hanks sought after prevailing in this "well-founded suit for any unpaid wages." *See Saacks*, 855 So.2d at 371. Accordingly, we find no abuse of discretion in the amount of attorney fees the trial court awarded Hanks under La.R.S. 32:632. LAC's sixth assignment of error lacks merit.

In his answer to appeal, Hanks seeks an additional award of $32,500.00 in attorney fees for the costs he incurred in defending this appeal. In a footnote in its reply brief to this court, LAC asserts that Hanks' request for additional attorney fees on appeal should be denied because such an award is unwarranted and the amount requested is excessive. We disagree and conclude that such an award is proper in this case. *See*, *e.g.*, *Williams*, 888 So.2d 260; *Stutes v. Rossclaire Const., Inc.*, 575 So.2d 466 (La.App. 3 Cir. 1991); *LeDoux v. Bay State Mgmt. Corp.*, 499 So.2d 945 (La.App. 3 Cir. 1986). Given the complexity of this matter, we find that an additional $28,000.00 in attorney fees will reasonably compensate Hanks for successfully defending this appeal.

## DECREE

For the foregoing reasons, we affirm both the August 3, 2015 and January 4, 2016 judgments. We award Hanks additional attorney fees in the amount of $28,000.00 for the work performed in conjunction with this appeal. All costs of this appeal are assessed against LAC.

**AFFIRMED AND RENDERED**.